UNITED STATES of America,
Plaintiff-Appellee,

v.

Reginald J. HOLZER,
Defendant-Appellant.

No. 86–1879.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1986.
Decided April 3, 1987.

Edward L. Foote, Winston & Strawn, Chicago, Ill., for defendant-appellant.

Howard M. Pearl, Asst. U.S. Atty. (Anton Valukas, U.S. Atty.) Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

A federal jury found Reginald Holzer, a former Cook County circuit judge (that is, a trial judge in Cook County's court of general jurisdiction), guilty of mail fraud, 18 U.S.C. § 1341, extortion, 18 U.S.C. § 1951 (the Hobbs Act), and violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. He was sentenced to a total of 18 years in prison, and appeals. He raises a variety of grounds, but most are either frivolous or foreclosed by previous decisions. The only issues warranting discussion are whether Holzer's conduct was fraudulent within the meaning of the mail-fraud statute and extortionate within the meaning of the Hobbs Act.

The previous prosecutions resulting from the "Greylord" investigation have involved the traffic and misdemeanor divisions of the Cook County Circuit Court, illustrative decisions being *United States v. LeFevour*, 798 F.2d 977 (7th Cir.1986), and *United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985). This is the first case to involve the law and chancery divisions. Between 1968 and 1978 Holzer was assigned to the law division, which handles mainly personal-injury suits. Between 1978 and his indictment in 1985, he was assigned to the chancery division, which hears equity suits. While in the law division and then the chancery division Holzer repeatedly asked lawyers who were representing parties in matters over which he was presiding, and (in the chancery division) equity receivers appointed by him, for help in getting bank loans to shore up his precarious finances. Construing the facts as favorably to the government as the record permits, which we must do in view of the jury's verdict, we shall now describe the transactions on which Holzer's conviction is based.

Gerald Morris, a personal-injury lawyer, was summoned to Holzer's chambers in 1972, shortly after a block of 22 cases in which Morris's firm represented the plaintiffs had been reassigned to Holzer. Holzer told Morris that he had financial problems and had to borrow five to ten thousand dollars right away. Although Holzer had known Morris for more than 20 years, he had never before asked Morris for a loan. Morris and his partner arranged for a relative to lend Holzer $3,500. They gave the relative the money needed for the loan so that he wouldn't be out of pocket himself. The following year, after another block reassignment of Morris's cases to Holzer, Holzer asked Morris to arrange another loan, even though Holzer had not paid any interest, or repaid any principal, on the first one. A $5,000 loan, similar to the previous one, was made. Neither loan has been repaid. At Holzer's request, Morris later arranged for $25,000 in bank loans to Holzer, which Morris's law firm guaranteed.

In 1977, Fred Lane, who was representing a party in a case pending before Holzer, signed a check for $2,500 made out to Holzer. At Holzer's request, Lane's secretary used the check to buy a cashier's check payable to a bank in which Holzer had an account. The check was entered in

the law firm's loan account, but there were no formal loan papers and the "loan" has never been repaid.

Between 1978 and 1983, Holzer borrowed $25,000 from Ernest Worsek, whom Holzer appointed to many receiverships during this period. Worsek also arranged a $10,000 loan from his friend Zilka to Holzer, gave Holzer $500 in department store gift certificates, and bought a large life insurance policy from Holzer's wife, an insurance agent. The loans were all made at Holzer's request. Worsek (who had to borrow money in order to fund them) complied with the requests only because he feared losing the receiverships, which generated almost half his total income. In 1983 Worsek told Holzer that he would no longer make the payments on the Zilka loan, as he had been doing—whereupon Holzer stopped assigning receiverships to Worsek. Holzer repaid only $7,000 of the two loans.

In 1984 Worsek told Holzer that he had been interviewed by FBI agents. The two met at Holzer's request in another judge's jury room. At Holzer's suggestion they communicated in writing at this meeting, and when the meeting was over Holzer tore up the notes and flushed them down the toilet. After the meeting Holzer again began appointing Worsek to receiverships-nine altogether in the balance of 1984.

In 1979 Holzer summoned Russell Topper, who represented plaintiffs seeking $2 million in damages in a case pending before Holzer, to his chambers, told Topper he was in desperate need of money, and asked him for help in getting an unsecured $10,000 bank loan. When the bank that Topper contacted refused to make Holzer an unsecured loan, Topper purchased a $10,000 cashier's check payable to Holzer and gave the check to him. Although Holzer promised to repay the loan within a couple of months, he did not sign a promissory note or give Topper a copy of his financial statement, and there was no discussion of interest on the loan. Several months later, on the eve of trial, Topper came to Holzer, told him that the $10,000 had been Topper's own money, and suggested that Holzer recuse himself. They agreed that before he did so they would try to settle the case. When, notwithstanding Holzer's efforts, settlement negotiations fell through, Holzer recused himself. The "loan" was never repaid.

Also in 1979 Holzer summoned to his chambers Nathan Powell, who represented the defendant in a suit pending before Holzer, and told him he needed a $10,000 loan. Powell said that without security Holzer would not be able to get a loan. Holzer pressed him to do what he could. Although Powell had known Holzer for many years, this was the first time that Holzer had asked him for help with a loan. After getting his client to put up collateral for a $10,000 bank loan to Holzer, Powell told Holzer to call an officer of the bank named Maram. Powell told Holzer that someone had put up collateral for the loan but didn't tell him who. Several months earlier Maram had rejected Holzer's application for a $10,000 unsecured loan, but this time, with the loan secured, the application was approved.

In 1980 two lawyers with cases before Holzer, Neistein and Richman, made payments at Holzer's request on a bank loan which they had arranged for him and on which he was delinquent. The following year Becker, a lawyer with a case before Holzer, and Green, Becker's client, arranged at Holzer's request for a bank loan of $24,000 to Holzer, covertly funded by a bank that Green owned. Although Holzer was not told about Green's help in getting the money for the loan, some of the payment notices that the lending bank sent to Holzer showed Green's name typed in the place for the borrower and then crossed out (but still readable). Also that year, Holzer asked Karzov, whom he had appointed to be the attorney for one of Worsek's receiverships, for a $1,000 cash loan. Karzov gave him the money. Half the loan was repaid after the FBI began its investigation of Holzer; the other half has never been repaid.

In 1982 Stanley Lieberman sought receivership appointments from Holzer, and in 1983 received an appointment. After the two had lunch together one day, they re-

paired to Holzer's chambers where Holzer told Lieberman that he was in extreme financial difficulty and needed a loan of $25,000 to $30,000 (apparently to repay the bank loan he had gotten through Becker and Green). After Holzer "struck out" at two downtown banks (one of which wrote him that it was rejecting his loan application because of his high ratio of debt to equity), Lieberman at Holzer's request approached a suburban bank with which Lieberman did business and asked it to make a loan to Holzer. Lieberman agreed to guarantee the loan and told the bank not to tell Holzer about the guarantee. The loan was made and later Holzer appointed Lieberman to another receivership.

On twelve occasions between 1979 and 1983, Holzer appointed Burton Schatz as an attorney for a receiver (usually Worsek) or as a guardian *ad litem,* and during this period Schatz wrote checks to Holzer totaling $18,300. This was about $10,000 less than the fees Holzer had awarded him for his services in these appointments.

Rule 68 of the rules of the Illinois Supreme Court requires each circuit judge to file an annual ethics statement. In a confidential portion of the statement the judge is required to list "creditors to whom amounts in excess of $1,000 are owed by me," and also any potential conflicts of interest. Until 1985, which was after Holzer became aware of the FBI's investigation of his affairs, his statement listed as creditors none of the persons we have mentioned from whom or through whom he had obtained loans. The supplemental statements that he filed in 1985 were incomplete. And in response to questionnaires submitted to judicial candidates by a citizens' group, Holzer when he was running for election as circuit judge in 1974 and for reelection in 1982 had stated that he accepted "no gifts at all" and "absolutely no contributions, gifts, or favors of any kind at any time."

The question is whether the facts we have recited establish fraud within the meaning of the mail-fraud statute and extortion within the meaning of the Hobbs Act. In arguing that they do not, Holzer asks us to accept his characterization of the facts: He was hard up for money and asked assistance of anyone he thought might be able to introduce him to a bank, and naturally the persons solicited included lawyers and naturally some of them had matters before him; he had no idea that the lawyers were guaranteeing the loans they helped him to obtain from banks, and he never threatened the lawyers with adverse rulings if they failed to help him and never promised them favorable rulings if they did help him; nor were any of his rulings influenced by the loans; nor, finally, did it occur to him that he had a duty to disclose these dealings to counsel, the state, or the public. Although this is a possible (but highly implausible) characterization of the facts, it is not one that the jury was required to accept. An alternative characterization, one that is both more plausible and fully supported by the evidence at the trial, is that Holzer over a period of many years used his public office to obtain money through deceit and extortion.

Fraud in its elementary common law sense of deceit—and this is one of the meanings that fraud bears in the statute, see *United States v. Dial,* 757 F.2d 163, 168 (7th Cir.1985)—includes the deliberate concealment of material information in a setting of fiduciary obligation. A public official is a fiduciary toward the public, including, in the case of a judge, the litigants who appear before him, and if he deliberately conceals material information from them he is guilty of fraud. When a judge is busily soliciting loans from counsel to one party, and not telling the opposing counsel (let alone the public), he is concealing material information in violation of his fiduciary obligations.

The standard of materiality is an objective one; it does not reach every piece of information that a particular litigant might like to have about a judge. A judge need not disclose information that would not make a reasonable person think him incapable of presiding impartially in the case. Thus he need not, in a case to which Sears Roebuck is a party, disclose that he

is a customer of Sears; he need not, in a case involving the First National Bank, disclose that he has an account at the bank. *United States v. Gregory*, 508 F.Supp. 1218, 1220 (S.D.Ala.1980), app. dismissed and mandamus denied, 656 F.2d 1132 (5th Cir.1981). The facts of this case as the jury could reasonably have found them are dramatically different. Here is a man in desperate financial straits, unable to borrow through ordinary channels, who turns for help to people over whom he has power: lawyers in cases over which he is presiding and persons to whom he has the power to award lucrative receiverships and guardianships. When he asks them for help, either they lend their own money directly to him or, as if by magic, bank loans that he had tried and failed to get suddenly materialize. It is doubtful that these transactions should be called "loans." Out of some $200,000 in documented receipts from these sources, Holzer repaid almost nothing; and the evidence supports an inference that he never intended to repay the money in full, realizing that the lawyers and guarantors of the loans would never press him for repayment, because they would fear retribution—with reason, if one may judge from Worsek's fate after he stopped making payments on the Zilka loan. Most of the loans, indeed, seem to have been thinly disguised bribes. Several listed on a private record that Holzer kept of his personal debts were crossed out—without having been repaid.

The character of the "loans" has a two-fold significance. First, it shows that these were not arms-length transactions (though the Illinois Supreme Court's Rule 68 requires disclosure even of arms-length loans). Neither party to an arms-length transaction is expected to show gratitude, or to feel a sense of residual obligation, to the other. A judge is not "grateful" to Sears Roebuck for selling him a lawnmower at the market price of lawnmowers. It is when the other party to the transaction is doing him a favor that an inference of gratitude, or an inference that a quid pro quo can be expected, may arise and make the failure to disclose the transaction to counsel for the opposing litigant material.

■ Second, the systematic and long-continued receipt of bribes by a public official, coupled with active efforts to conceal the bribe-taking from the public and the authorities (as in Holzer's Rule 68 filings and his response to voter questionnaires), is fraud (again in its elementary sense of deceit, and quite possibly in other senses as well), even if it is the public rather than counsel that is being kept in the dark. It is irrelevant that, so far as appears, Holzer never ruled differently in a case because of a lawyer's willingness or unwillingness to make him a loan, so that his conduct caused no demonstrable loss either to a litigant or to the public at large. See, e.g., *United States v. Keane*, 522 F.2d 534, 541, 546 (7th Cir.1975); *United States v. Lovett*, 811 F.2d 979, 985 (7th Cir.1987); *United States v. Manton*, 107 F.2d 834, 846 (2d Cir.1939). How can anyone prove how a judge would have ruled if he had not been bribed? And if it were necessary to show that the judge had ruled differently than he would have done if he had not been bribed, it would mean that a judge would not be committing fraud when he demanded and received equal bribes from both sides of a lawsuit. A system in which judges are paid by the parties rather than by the state does not inherently distort judgment; it is, indeed, the system used in arbitration, which is a type of adjudication, and it was also used in the judicial system of England until well into the nineteenth century. But the State of Illinois has decided that judges shall not be compensated out of fees paid by the litigants, and a judge who disregards this decision deprives the state of whatever benefits (what the cases call the public's "intangible rights") it hoped to obtain from the system of compensation that it did adopt. He also makes litigants pay double for judicial services—once in their taxes (which pay the judges' salaries), and the second time in fees paid directly to the judge. When, in addition, the judge conceals what he is doing, he commits fraud; for what he is concealing is clearly material information to his employer, the state.

*United States v. Rabbitt*, 583 F.2d 1014, 1024–26 (8th Cir.1978), does not require a

different conclusion. A state legislator received a secret commission from an architectural firm to help it get state contracts. Not only was there no evidence that his efforts on the firm's behalf caused any actual loss to the state, but the court was also not convinced that his conduct had deprived the state of its right to honesty and fairness in the performance of the defendant's official duties, because the contracts were awarded on a merit basis by officials over whom the defendant had no power. We very much doubt the soundness of this reasoning. The fact that the defendant did not control the award of contracts should not be decisive if his position as a state legislator gives his recommendations a weight independent of their intrinsic merit. But the case in any event is different from this one. Holzer received money from persons appearing before him in his official capacity rather than from persons having business before other judges or before the executive or legislative branches of state government. The Eighth Circuit upheld Rabbitt's conviction of mail fraud for peddling his influence to obtain legislation favorable to a trade association that had bribed him.

█ Holzer argues that he could not be deemed to have acted fraudulently when there was no clear-cut ethical rule prohibiting him from receiving loans from lawyers with business before him. This thrust is wide of the mark, since even if the receipt of the loans were not prohibited, the failure to disclose their receipt, at the very least to counsel opposing the lenders, would be fraudulent in the circumstances. But this point to one side, we do not agree that the absence of an explicit rule should make a difference. We do agree that the words "scheme or artifice to defraud" don't reach everything that might strike a court as unethical conduct or sharp dealing, despite broad language to this effect in cases that we criticized in *United States v. Dial, supra,* 757 F.2d at 170, including our own *United States v. Serlin,* 538 F.2d 737, 744 (7th Cir.1976). The frequently quoted suggestion in *Gregory v. United States,* 253 F.2d 104, 109 (5th Cir.1958), that whatever is not a "reflection of moral uprightness, of

fundamental honesty, fair play and right dealing in the general and business life of members of society" is fraud (see, e.g., *United States v. Bohonus,* 628 F.2d 1167, 1171 (9th Cir.1980)) cannot have been intended, and must not be taken, literally. It is much too broad and, given the ease of satisfying the mailing requirement, illustrated by *United States v. Green,* 786 F.2d 247, 249–57 (7th Cir.1986), would put federal judges in the business of creating what in effect would be common law crimes, i.e., crimes not defined by statute. However, as we emphasized in *Dial,* elaborate efforts at concealment—illustrated here by Holzer's clandestine meeting with Worsek after the FBI investigation began, by his failure to list the "loans" on his Rule 68 statement, and by his repeated public denials of receiving favors of any kind (which certainly included such questionable loans from counsel appearing before him)—are powerful evidence that a defendant's conduct violates an ethical standard well known to him and to the whole community, and not just something thought up after the fact by a perhaps overly sensitive federal judge. See 757 F.2d at 168; *United States v. Brown,* 540 F.2d 364, 375 (8th Cir.1976).

[7] We need not consider whether the receipt of bribes might be fraud under the mail-fraud statute if done openly. The legal meaning of "fraud" is not limited to deceit or misrepresentation; it includes overreaching, undue influence, and other forms of misconduct. There have been cases, like *United States v. Gorny,* 732 F.2d 597, 601–02 (7th Cir.1984), where convictions of mail fraud based on bribe-taking were upheld without consideration of concealment. The issue is academic, since no public official in the United States takes bribes openly, but is in any event not one we need consider here, since the instructions made intent to deceive an element of the fraud with which Holzer was charged.

A law review note argues from the legislative history of the mail-fraud statute that Congress never intended the statute to reach a case such as this where the public official does not obtain anything of value

310

from the victims of the fraud—from litigants whose lawyers did not make loans to Holzer, or from the citizens of Illinois whose confidence in their government may have been undermined. Comment, *The Intangible-Rights Doctrine and Political-Corruption Prosecutions Under the Federal Mail Fraud Statute*, 47 U.Chi.L.Rev. 562 (1980). The argument is repeated in a case pending in the Supreme Court. See Brief for Petitioner Gray in *McNally v. United States*, Nos. 86–234, 86–286, October Term 1986. The argument depends on the view that the meaning of fraud in the mail-fraud statute was frozen by the conception of fraud held by the framers of the statute when it was first passed back in the nineteenth century. This seems to us the opposite and equally untenable extreme from arguing that fraud is whatever strikes a judge as bad, but in any event the "intangible rights" concept that the argument attacks is too well established in the courts of appeals for us to disturb.

We turn to the issue of extortion, defined in the Hobbs Act as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear or under color of official right." 18 U.S.C. § 1951(b)(2). Holzer questions the sufficiency of the evidence to support an inference that the lawyers who made loans to him were acting out of fear.

■ Except in cases involving a threat, or actuality, of force or violence, the payment must be induced either by fear of what the payee might do if payment were not forthcoming, or by the defendant's office ("color of official right"). The two types of inducement (fear and office) should be distinguished. The first is based on fear of retribution by the official, wielding his official powers; the second is based on a hope of benefit from the exercise of those powers. The first covers cases of actual or implied threat to use (or not use) official powers to harm a person if he doesn't pay the official, and corresponds to the lay sense of "extortion"; the latter covers cases where bribes are offered and accepted even without having been solicited. See *United States v. Braasch*, 505 F.2d 139, 150–51 and n. 7 (7th Cir.1974). Both types of "extortion" were charged in this case, and proved. When a judge urgently and insistently asks a lawyer in a case before him for a loan, the request connotes an implied threat (or so a jury could reasonably conclude) to rule against the lawyer if he turns the judge down. It is irrelevant that the judge would not, and knows he would not, retaliate against the lawyer if the lawyer spurned his request, just as it is irrelevant in a robbery case that the robber would not in fact have pulled the trigger if his victim had refused to hand over the money. A threat is not a state of mind in the threatener; it is an appearance to the victim. A statement that a person is intended to and does understand to be a threat is a threat even if the person making it is bluffing. It is therefore enough that a reasonable jury could have found that Judge Holzer's requests for loans were intended to and did induce the persons to whom they were addressed to think that if they didn't comply they might be visited with subtle or not-so-subtle judicial retaliation. See *United States v. Crowley*, 504 F.2d 992, 995 n. 5 (7th Cir.1974). It was not subtle in Worsek's case.

Some of the lawyers whom Holzer solicited had been acquaintances of his for many years, yet not until they had cases pending before him did he solicit their financial assistance. Worsek and Lieberman were serving as receivers, at his pleasure, when he solicited them. He made clear to many of the lawyers and receivers that he was in desperate straits. He could leave them to draw the natural inference that if they didn't play ball he might retaliate, as in fact he did retaliate against Worsek. They testified that that was precisely the inference they did draw. Holzer testified that he did not mean to convey any such impression, but the jury was not required to believe him. He is an intelligent man fully capable of understanding that the lawyers and receivers he was dealing with were digging into their own pockets to help him, out of fear of the financial and professional consequences if they did not; and

the jury was entitled to conclude that he deliberately took advantage of their fears to line his pockets. He was not the passive recipient of favors; he actively solicited them, using his office as the weapon, though except in the case of Worsek the weapon apparently remained sheathed.

It would not help Holzer even if he were the passive recipient of loans, pressed on him by lawyers eager to curry favor with him. Extortion "under color of official right" equals the knowing receipt of bribes; they need not be solicited. That at least is the view in this circuit. See *United States v. Murphy, supra,* 768 F.2d at 1530; *United States v. Blackwood,* 768 F.2d 131, 134 (7th 1985); *United States v. Schmidt,* 760 F.2d 828, 832 (7th Cir.1985); *United States v. Price,* 617 F.2d 455, 458 (7th Cir.1979). The Second Circuit has taken a different view, see *United States v. O'Grady,* 742 F.2d 682 (2d Cir.1984) (en banc), but one we have declined to follow. In this circuit it is extortion if the official knows that the bribe, gift, or other favor is motivated by a hope that it will influence him in the exercise of his office and if, knowing this, he accepts the bribe. There is an air of the academic about this intercircuit conflict because, as a matter of fact, in none of the cases in which the issue has been pressed was the official passive (here he was hyperactive in the solicitation of bribes thinly disguised as loans). The issue was how the jury should be instructed. That issue is not presented here, since Holzer does not complain about the instructions.

The facts reveal and the jury found an appalling betrayal of the public trust. The evidence was ample, the instructions correct, the conduct of the trial fair, the sentence reasonable, and the judgment is

AFFIRMED.