**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Wallace DAVIS, Jr.,**
**Defendant–Appellant.**

No. 88–1769.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 6, 1989.

Decided Nov. 21, 1989.

Caryn Jacobs, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., David J. Stetler, Howard M. Pearl, Asst. U.S. Attys., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Paul Bradley, Chicago, Ill., Gary Ritvitz, for defendant-appellant.

Before BAUER, Chief Judge, EASTERBROOK, and MANION, Circuit Judges.

BAUER, Chief Judge.

Wallace Davis, Jr. once served as the Alderman and Democratic Committeeman for the 27th Ward of the City of Chicago. In addition to his participation on the City Council, Davis was also employed as a City employee. An undercover investigation by the Federal Bureau of Investigation revealed that Davis often confused civic service with abuse of his office. In short, Davis was a local politician who "seen his opportunities and he took 'em."[1] Davis's political opportunism led to a grand jury indictment charging him with racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); three counts of extortion in violation of 18 U.S.C. § 1951; and one count of making a false statement to federal agents in violation of 18 U.S.C. § 1001. A jury convicted Davis of all of the charges except for one of the extortion counts and its corresponding charge as a racketeering act. In this appeal, Davis challenges certain portions of his conviction on a number of grounds and the factual basis for his sentence.

## I. BACKGROUND

The grand jury indicted Davis based upon the defendant's activities as an alderman in relation to five distinct events. The evidence adduced at trial, when seen in a light most favorable to the prosecution, reveals that Davis' conduct relative to those events consisted as follows.

1. The SRS Scheme: "Things Ought to be Fixed Up Nice and Quiet."[2]

In the spring of 1985, the City of Chicago awarded a contract to the Datacom Company to collect over $600 million in overdue parking fines owed to the City. A competing New York company, Systematic Recovery Systems, Inc. ("SRS"), was not content with the City's award decision. Accordingly, SRS entered into a campaign to discredit Datacom and wrest the potentially lucrative contract away. SRS's president, Bernard Sandow, admitted at trial that SRS had obtained similar contracts in New York through bribing public officials. Intent on employing the same strategy in Chicago, SRS hired Michael Burnett to spearhead SRS's objectives relative to the Chicago collections contract. Sandow instructed Burnett to "do whatever you have to bring in the Parking Violation Bureau account in Chicago." Unbeknownst to Sandow or SRS, Burnett was subsequently arrested by FBI agents on charges unrelated to the SRS campaign. Upon his arrest, Burnett informed the agents about the impending SRS campaign and agreed to cooperate with the FBI by recording his meetings with Chicago City officials.

One of Burnett's initial tape-recorded meetings in Chicago was with Alderman Perry Hutchinson. Burnett offered Hutchinson $10,000 to sponsor a City Council resolution requesting an investigation of Datacom. Hutchinson agreed to do so, and the two discussed their strategy, including purchasing the support of additional aldermen for the purpose of overriding the Washington Administration's probable opposition to the investigation. Hutchinson assured Burnett that in addition to the twenty-nine aldermen who invariably opposed the Washington Administration, "[t]here are a couple of guys I can always pick up like Wallace Davis." Burnett then began to solicit Davis's support, at first

---

**1.** G. Plunkitt, *Plunkitt of Tammany Hall: A Series of Very Plain Talks On Practical Politics* 3 (W. Riordon, recorder 1963 ed.).

**2.** *Id.* at 74.

through Hutchinson and then directly. Burnett and Davis finalized their arrangement over dinner at a public restaurant on December 16, 1985. During their discussions, Burnett, who was wearing a "wire," noted that SRS was willing to pay the price to achieve its objective. Seeking to clarify what that "price" was and terms of their arrangement, Davis asked, "[w]hat kind of numbers are we talking about?" Burnett responded:

I'll drop five on you initially. And I'll have another five for you, right after the first of the year and you'll have all the support in the world for your organization. Give me a wish list. Tell me what you want. You'll get it ... Ah, as soon as they're knocked outta the box, I'll deliver a major number to you. Alright? You gotta quarter coming down when they're outta the box and we're in the box. Now that's over and above the ten, that I'm talking about.

\* \* \* \* \* \*

I pay cash, and cash is always the problem ... I ain't gonna give you a check.

Subsequent to the dinner meeting, Davis and Burnett met on December 19, 1985, at Burnett's apartment. At this tape-recorded meeting, Davis accepted $5,000 in cash from Burnett in a transaction that was witnessed by Raymond Akers, Jr., Burnett's assistant. Upon paying Davis the money, Burnett explained:

Wallace, here's five, the other five after the first of the year. And when Datacom is out you got a quarter and your organization is on with us all the way, whatever you need.

Davis took the money and assured Burnett that he was a "team player" who would "be right there with you 100%." Akers testified that he witnessed Davis accept a stack of bills from Burnett that looked like a stack equal to $5,000.

2. The Condemnation Action: "Men Ain't in Politics for Nothin'." [3]

In the fall of 1983, the City initiated a condemnation action against a building located in Davis's ward. Charles Scala and William Kasten owned the building and the restaurant which it housed. Because they wanted to keep both the building and the restaurant, they sought to challenge the condemnation action. They also wanted to obtain the City's approval to purchase a lot adjacent to their building. They contacted Davis to obtain his support. Under the practices of the City Council, the ward alderman's support was a central factor effecting the Council's ultimate action on such matters. After Davis promised to help Scala and Kasten, he approached Scala while both the condemnation and purchase decisions were still pending before the City Council and asked for $3,000 in cash. Scala testified that because he believed that he needed Davis's support, he and Kasten borrowed the money from their fathers to make the payment. When Scala went to Davis's home to make the payment, Davis met him at the door, accepted the money, and assured him that "things will be done." Subsequent to the payment, the City dropped the condemnation action after Davis threw his support behind the interests of Scala and Kasten. Scala testified that in light of this result, he believed that he got the services he paid for.

3. The Nepotism Scheme: "[S]he Ponies Up—All From Gratitude." [4]

In August of 1984, Davis employed his niece, Etta Harris, as his aldermanic secretary, a $21,000 position on the City's payroll. Upon hiring Harris, Davis instructed her to have her bi-weekly payroll check sent to him. Davis told Harris that upon receiving the check from her, he would have her sign it. He would then cash it and pay her $320 out of the proceeds. Davis kept the remaining portion of her salary for himself.

Prior to the spring of 1985, Davis paid Harris $320 out of her payroll check except on a few occasions over the holidays when he allowed her to keep her entire check. When Harris demanded that more of her check be paid to her, Davis told her that it was the best he could do because "I have to pay somebody else." On two occasions,

---

**3.** *Id.* at 37.

**4.** *Id.* at 74.

Davis told Harris if she wanted more money, she would be better off drawing unemployment. For example, Harris testified that in response to one of her requests, Davis stated that:

> ... he had to pay someone off—when I paid him, he had to pay someone; and that if I couldn't go by his rules, that maybe I would get more drawing unemployment.

Davis eventually agreed to increase Harris's share of her paycheck to $400. However, on Thanksgiving Day of 1985, Davis fired Harris, telling her that he did not want people to find out that he had his niece on his aldermanic payroll.

### 4. The Denial of the SRS Campaign: "Accused of Graftin'"[5]

On December 20, 1985, FBI agents went to Davis's home to interview him about the December 16, 1985 dinner meeting with Burnett concerning the SRS campaign and the December 19, 1985 payoff meeting with Burnett. Davis told the agents that he did not attend the dinner, which had been organized by another alderman. Davis also told the agents that he never met anyone from SRS, that SRS representatives never offered him money in exchange for his support, and that he never accepted any money from SRS representatives. He explained to the agents that it was his understanding that a company called Datacom had been awarded the collection contract.

### 5. Holding Up City Council Action: "the Ingratitude in Politics."[6]

From March through November of 1985, Davis supported the plans of the Wertheimer Box and Paper Company ("WBPC") to purchase city-owned property located in Davis's ward. The WBPC's request was approved by both the Chicago Department of Economic Development and the City Council. The only remaining obstacle to the sale was the City Council's requirement that an ordinance be passed granting the sale. On one occasion in late December of 1985 and one occasion in early January of 1986, Davis approached Jay Wertheimer, the owner of the WBPC, and asked him for a personal loan and a campaign contribu-

tion. Although Council action on WBPC's plan was still pending, Wertheimer refused Davis's request. On April 8, 1986, Davis asked that the City Council "hold" any action relating to the ordinance allowing WBPC to purchase the property. Jay Wertheimer testified that when he contacted Davis to inquire about the delay in approval, Davis stated that "he had to re-evaluate his commitment to whom and what he supported."

After hearing the evidence in this case, the jury convicted Davis of one count of violating RICO, two counts of extortion and attempted extortion, and one count of making false statements to the FBI. The jury acquitted Davis of the attempted extortion charge in Count III involving the request for money from Jay Wertheimer in violation of 18 U.S.C. § 1951(b)(3), and the corresponding charge in Racketeering Act IV under the RICO count. The trial court entered judgment on the jury's verdict on October 13, 1987. On April 8, 1988, the court sentenced Davis to concurrent terms of eight and one-half years on Counts I, II and IV, and five years on Count V. Davis's appeal was timely filed on April 12, 1989.

## II. ANALYSIS

■ The brunt of Davis's claims on appeal involve his conviction of extortion under 18 U.S.C. § 1951. His initial argument is that the evidence of his conduct in relation to Scala and Kasten and the condemnation action was insufficient for a jury to find him guilty of extortion or Hobbs Act extortion in violation of § 1951. Davis's claim is also directed at the jury's verdict on the corresponding charge in Racketeering Act I(a). In pressing a sufficiency of the evidence claim, Davis must shoulder a "heavy burden" to succeed in having the jury's verdict reversed. *United States v. Doerr*, 886 F.2d 944, 968 (7th Cir.1989) (quoting *United States v. Johnston*, 876 F.2d 589, 593 (7th Cir.1989). This court will disturb a jury's verdict only when the trial record contains no evidence, no matter how it is weighed, from which a rational trier of fact could find the essential elements of the crime beyond a reasonable

---

**5.** *Id.* at 62.

**6.** *Id.* at 36.

doubt. *Doerr*, 886 F.2d at 968. As previously noted, the evidence of record must be reviewed in a light most favorable to the prosecution, with all reasonable inferences drawn in the prosecution's favor. *United States v. Hogan*, 886 F.2d 1497, 1502 (7th Cir.1989) (quoting *United States v. Douglas*, 874 F.2d 1145, 1151 (7th Cir.1989).

■ The question thus presented on review is whether there is any evidence of record which would allow a rational trier of fact to conclude that Davis wrongfully induced Scala and Kasten to pay him $3,000 through either an actual or threatened fear of economic harm, or conduct under the color of official right.[7] In *United States v. Holzer*, 816 F.2d 304, 310 (7th Cir.1987), *vacated and remanded on other grounds*, 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1988), this court recognized that the two forms of extortion proscribed by § 1951 are equally applicable to the conduct of public officials who take unlawful advantages of "opportunities" relating to their public office. In reaching this conclusion, we noted that the scope of the two statutory prohibitions should be distinguished.

■ A public official violates the first prong of § 1951(b)(2) when he or she either acts or wields the powers of office in such a way that it causes a victim to fear some form of retribution if payment of a demanded price is not forthcoming. *Id.* at 310. In short, "[e]xtortion by wrongful use of fear of economic harm is established by showing that the defendant preyed upon or exploited the victim's fear of economic harm." *United States v. Nedza*, 880 F.2d 896, 902 (7th Cir.1989) (quoting *United States v. Lisinski*, 728 F.2d 887, 890 (7th Cir.), *cert. denied*, 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984)). It is obvious that the statute prohibits an official from exploiting a victim's fear through both threatening positive action that will harm the victim, or threatening to withhold official action that will result in some form of

harm being visited upon the victim. *Holzer*, 816 F.2d at 310. Additionally, an official violates the "color of official right" prong of § 1951(b)(2) when he or she encourages or accepts payments prompted by the hope that the official will be influenced in the exercise of his or her powers. *United States v. Garner*, 837 F.2d 1404, 1423 (7th Cir.1987), *cert. denied* — U.S. —, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988); *Holzer*, 816 F.2d at 310.

In the face of these principles, Davis contends that the evidence presented at trial surrounding his acceptance of $3,000 from Scala and Kasten was insufficient for the jury to convict him of extortion under the "color of official right" prong of § 1951. Our review of the record reveals that there is more than fair support for the jury's verdict under either prong of the statute. To begin with, the jury was presented with evidence that under the practices of the City Council, Davis's continued support was necessary to defeat the condemnation action. In other words, if Davis were to have withheld his support, the condemnation action would have likely succeeded, thus harming the interests of Scala and Kasten. At the same time, Davis's support was necessary for Scala and Kasten to receive City Council approval of their proposed purchase of the property adjacent to their building. Davis made his request for $3,000 in "cash" while both of these actions were still pending. Scala's testimony at trial revealed his fears concerning the condemnation action and his belief that the payment to Davis was necessary to secure the Alderman's support. For example, Scala testified that his life savings were invested in the building and restaurant, and that he believed that he would lose everything if the condemnation action was not defeated. In fact, Scala specifically testified that he would not have paid the $3,000 if Davis were not an Alderman whose support he needed.

---

7. In pertinent part, 18 U.S.C. § 1951 provides: (a) Whoever in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, ... shall be fined not more than $10,000 or imprisoned not more than twenty years or both.

(b) As used in this section—
... (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear or under color of official right.

■ Davis also argues that the evidence was insufficient because he had already promised his support to the two constituents before asking them for $3,000 as a "political contribution." The evidence contradicts this claim. Scala testified that after his first discussion with Davis, he returned to tell Kasten that the Alderman offered his support, but that "it might cost some money." In any event, Davis asked for the $3,000 when both actions were still pending. The jury could rationally have found that Davis's request for $3,000 was explicitly or impliedly linked to his continued support of Scala's and Kasten's interests *vis a vis* the condemnation action. The jury's verdict as to Count II alleging both extortion and Hobbs Act extortion is fully supported by the record.[8]

■ Davis also challenges two of the trial court's evidentiary rulings.[9] His first claim is that he was denied a fair trial when the trial court denied his request to admit into evidence a tape recording of him being interviewed by Walter Jacobson, a news reporter for a local television station. Davis asserts that the interview supported a central component of his defense at trial; namely, that he thought Burnett was a representative of Datacom rather than SRS. Davis argues that the recording should have been admitted under Fed.R. Evid. 801(d)(1)(B) as a prior consistent statement which would have rebutted the government's charge that he fabricated the misunderstanding defense.

The trial court did not abuse its discretion when it denied Davis's request to admit the recording. In *United States v. Monzon*, 869 F.2d 338 (7th Cir.1989), this court recently reviewed the conditions which must be met before a prior consistent statement may be admitted as nonhearsay under Rule 801(d)(1)(B):

First, the declarant must testify at trial and must be subject to cross-examination. Second, the prior statement must be consistent with the declarant's trial testimony. Third, the statement must be offered to rebut an express or implied charge of recent fabrication. Finally, the statement must have been made before the declarant had a motive to fabricate.

*Id.* at 342–43 (citations omitted). *See also United States v. Harris*, 761 F.2d 394, 398–99 (7th Cir.1985). Davis's statements in the December 27, 1985, interview with Jacobson do not meet the final requirement because they were made seven days after Davis was interviewed by the FBI regarding his dealings with Burnett and SRS. When Davis was interviewed by the FBI on December 20, 1985, he was given an indication that his conduct was the subject of an investigation. His motive for fabricating the misunderstanding defense arose at that point. The district court committed no error in refusing to admit the tape recording because Davis failed to establish the conditions for properly admitting a prior consistent statement under Rule 801(d)(1)(B).

■ Davis's second evidentiary claim is that his sixth amendment right to confront the witnesses against him was violated when the trial court admitted the tape recordings of his conversations with Burnett when Burnett was not called to testify. At trial, the court rejected Davis's objections to the admission of the tapes. The court

---

8. Davis also claims that the jury was improperly instructed as to the extortion charge in Count II. The district court gave the pattern jury instruction for § 1951 approved by this Circuit, which Davis contends is improper relative to the "under color of official right" prong of the statute. Davis concentrates exclusively on the last line of the instruction, which states that "[s]o long as the motivation of the payment focuses on the recipient's office, the conduct falls within the extortion statute." He argues that this portion of the instruction caused the jury to reach a guilty verdict on Count II based on the intentions of Scala and Kasten rather than upon his intent. This argument is meritless. Davis completely overlooks the entirety of the instruction, which refers to the defendant's wrongful use of his office to induce a payment, and the defen-

dant's knowledge "that the motivation of the alleged victim ... focused on the defendant's public position." Davis's selective reading of the instruction is unavailing.

9. Davis also contends that the evidence was insufficient to support three of the predicate acts alleged under the RICO count. Each of these claims is nothing more than an attempt to get this court to reweigh the credibility of the witnesses, such as Etta Harris, who testified before the jury. It is well settled that "absent extraordinary circumstances," the credibility of the witnesses is left for the jury to decide. *United States v. Dunigan*, 884 F.2d 1010, 1013 (7th Cir.1989). To the extent that Davis does not purport to raise such "extraordinary circumstances," these claims are without merit.

found that they were offered by the government as evidence of Davis's verbal acts or conduct reflecting his state of mind. In turn, the tape recorded responses of Burnett were admitted to provide the context of Davis's statements or admissions. The trial court instructed the jury to so limit its consideration of the taped conversations.

A number of circuits have embraced the evidentiary rule that the entirety of tape recorded conversations between a defendant and a third party informant are admissible where the defendant's statements are offered as verbal acts or admissions and the third party's statements are necessary to place the defendant's statements in a proper context. *United States v. Gutierrez–Chavez*, 842 F.2d 77, 81 (5th Cir.1988); *United States v. Jordan*, 810 F.2d 262, 264 (D.C.Cir.), *cert. denied*, 481 U.S. 1032, 107 S.Ct. 1963, 95 L.Ed.2d 535 (1987); *United States v. Price*, 792 F.2d 994, 996–97 (11th Cir.1986); *United States v. Whitman*, 771 F.2d 1348, 1352 (9th Cir.1985). In *Gutierrez–Chavez*, the Fifth Circuit explained that the recordings of the third party's statements are admissible as "reciprocal and integrated utterance[s] between two parties for the limited purpose of putting the response of the defendant in context of making them intelligible to the jury and recognizable as admissions." *Gutierrez–Chavez*, 842 F.2d at 81 (quoting *United States v. Lemonakis*, 485 F.2d 941, 948 (D.C.Cir.1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 885 (1974)). This Circuit has also relied on the rule as it was enunciated in *Lemonakis* to hold that the confrontation clause is not violated where the defendant's tape recorded statements are admitted as adoptive statements. *United States v. Rollins*, 862 F.2d 1282, 1297 (7th Cir.1988). In such circumstances, the defendant's Sixth Amendment interests are not implicated because he was not prohibited from cross-examining any witnesses against him. Similarly, the admission of Burnett's portion of the conversations do not implicate Davis's sixth amendment rights because the tape recorded statements were admitted for the limited purpose of placing Davis's statements in context. We must assume that the trial

court's limiting instructions to that effect were followed by the jury. *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985) (a crucial assumption of our constitutional system is that jurors follow the trial court's instructions).

■ Davis's final contention is that the court sentenced defendant based on a number of improper factual considerations. In making this claim, Davis again seeks to reassess the credibility of the witnesses at trial to show that the trial court improperly credited their testimony in fixing his sentence. It is beyond question that in entering the sentence, the trial court was relying not upon misinformation, but upon factual matters well within its discretion to consider. *See United States v. Harris*, 558 F.2d 366, 372 (7th Cir.1977). To the extent that the sentence imposed in this case was within the statutory limits and was not based on inaccurate information, it is beyond our review on appeal. *United States v. Turner*, 864 F.2d 1394, 1401 (7th Cir.1989). Accordingly, Davis's conviction and sentence are, in all respects,

AFFIRMED.