419 S.E.2d 676

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Mary M. BURD, Defendant Below, Appellant.**

No. 20001.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 17, 1991.

Decided Dec. 11, 1991.

Joanna I. Tabit, Deputy Atty. Gen., Charleston, for appellee.

James M. Bradley, Jr., Albright, Bradley & Ellison, Parkersburg, for appellant.

WORKMAN, Justice:

This case is before the Court upon the appeal of Mary M. Burd from a May 15, 1989, final order of the Circuit Court of Wood County sentencing the appellant to two concurrent one to five year prison terms for the attempted murder of Patricia Stone and for conspiracy to commit her murder, and two concurrent one to five year prison terms for the attempted murder of Aaron Stone and for conspiracy to commit his murder. The circuit court ordered that the sentences imposed for the crimes committed against Patricia Stone were to run consecutively to the sentences imposed for the crimes committed against Aaron Stone. The appellant contends that 1) the trial court erred in denying the defendant's motion for judgment of acquittal with respect to the counts charging the crime of attempted murder; 2) the trial court erred in denying the defendant's motion for judgment of acquittal with respect to the counts charging the crime of conspiracy; and, 3) the trial court erred in allowing the jury to consider the acts or declarations of Floyd Miller in determining whether a conspiracy existed when Miller was not subject to cross-examination as to such acts or declarations and when such acts or declarations were not made during or in furtherance of the conspiracy. Upon review of the petition and record submitted in this matter, and the briefs and oral argu-

ments of the parties, we find no error was committed by the trial court and accordingly affirm its decision.

The facts at trial revealed that the appellant and Jennings Stone had been involved in an affair since September 1985. Stone testified that on at least a dozen occasions, the appellant told him how his wife, Patricia, might be killed so that he and the appellant could be together. Subsequently, the appellant decided to implement a plan to murder Jennings Stone's wife and his fourteen-year-old son, Aaron.

Lieutenant Ronald Roberts, of the Wood County Sheriff's Department, testified that on October 5, 1986, Floyd Miller advised the department that on October 4, 1986, the appellant had contacted him and wanted to hire him to murder her boyfriend's wife and son. Wood County Sheriff's Deputy Gregory Chapman testified that on October 5, 1986, Miller gave him the $150 in cash which the appellant had given Miller to purchase a gun.

Miller agreed to cooperate with law enforcement authorities and on October 6, 1986, he was wired with an electronic monitoring device so that his conversations with the appellant could be recorded. The deputies taped two conversations between the appellant and Miller on that date.

The first conversation took place in Parkersburg, West Virginia. During this conversation, the recording of which was introduced at trial, the appellant described the location of the victims' home. Additionally, she gave Miller a map to the home, a physical description of both victims, a sketch of the interior of the home, and an envelope containing a suicide note. The purpose of the note was to make it appear as if Patricia Stone had shot her son Aaron and then turned the gun on herself. The appellant then offered to drive Miller to Charleston, West Virginia, to show him the exact location of the victims' house; however, she indicated that she would have to change cars before making the trip. Finally, she told Miller that she would pay him $500 as a down payment for committing the murders.

The second conversation, a recording of which was also introduced at trial, took place later that same day between the appellant and Miller while they were en route to Charleston. During this conversation, the appellant assured Miller that she would pay him the $500 upon their return to Parkersburg, indicating plans to use her Discover Card to acquire such sum. She also told Miller the round trip bus schedule between Parkersburg and Charleston so he could make travel arrangements. Further, the appellant and Miller discussed the manner in which the murders should occur and how Miller should leave the suicide note at the scene.

Upon arrival in Charleston, according to the taped conversations, the appellant showed Miller the route to the Stones' home, the location of the home, and the location of Jennings Stone's automobile. The appellant also suggested that Miller should knock on the door and ask to use the victims' telephone in order to gain entry to the home. Moreover, an alternative plan was discussed in the event that Jennings Stone was at home when Miller arrived. In that event, Miller was instructed to phone Stone and tell him that there had been a fight at one of his bars so that he would leave the home immediately. The appellant further instructed Miller on where to inflict the fatal wounds in order to make it appear as if Patricia had shot her son and then turned the gun on herself. Finally, the appellant assured Miller that once the murders were completed, he would receive an additional $550 as compensation.

Upon their return to Parkersburg, the taped conversation reflected that the pair went to a Sears store where the appellant obtained a $500 cash advance on her Discover Card account.[1] The appellant gave this money to Miller who later turned it over to the deputies. Finally, Miller told the appellant that he would commit the murders on the following day, October 7, 1986. The appellant instructed Miller that she would phone him at 11:00 a.m. on that date and advise him as to whether she had contacted Jennings Stone and made arrangements to have him away from the home at the time of the intended murders. Miller acknowledged that the appellant would call him and that he would not go to Charleston if he did not receive the telephone call.

The appellant was arrested in the early afternoon of October 7, 1986. There was no evidence offered at trial that the appellant actually made the phone call to Miller as discussed or that Miller received such a phone call. Additionally, no testimony was elicited from Jennings Stone as to whether the appellant had contacted him in order to get him away from his home on the day of the intended crime.

At trial, neither the defendant nor Miller testified. While Miller was the state's principal witness, he invoked his fifth amendment right to remain silent when called upon to testify. The prosecuting attorney requested that the trial court give Miller immunity in exchange for his testimony. This request was ultimately granted after Miller was given an opportunity to consult with his court-appointed attorney, but Miller continued to refuse to testify against his lawyer's advice and the trial court held him in contempt.[2] The state then requested that either a continuance be granted until Miller decided to testify, or that a mistrial be declared. The trial court took the motion under advisement; however, the trial continued and the state's motion was never granted.

The evidence offered against the appellant at trial included the taped conversations between the appellant and Miller and the testimony of a handwriting expert who

---

1. An employee from the credit department of Sears Roebuck testified that the appellant did obtain a cash advance on that date and in that amount, thus verifying that the transaction did occur.

2. The record is unclear as to why Miller became recalcitrant after cooperating in the investigation. Although the circuit court did incarcerate him upon his refusal to testify subsequent to the grant of immunity, the record indicates that his civil contempt would be purged at the conclusion of the trial, but it remained unclear whether any other measures were taken to compel his testimony.

identified the appellant's handwriting on documents, including the envelope and the suicide note found therein written by the appellant, and maps alleged to have been written by the appellant and given to Miller.[3]

Additionally, Miller's wife and Lt. Ronald Roberts of the Wood County Sheriff's Deputy testified on behalf of the appellant. Mrs. Miller's testimony indicated that her husband had contacted her several times at work, after his initial meeting with the appellant.[4] She further testified that when her husband showed her the $150 she urged him to contact the authorities. Lieutenant Roberts only testified that he had responded to a call to go to the Miller's home. Upon his arrival, Miller showed him $150 in cash and advised him where he had obtained the money. The officer took no further action at that time, other than advising Miller that another deputy would be sent out for further investigation the next day. Based upon this evidence, the jury convicted the appellant of two counts each of attempted murder and conspiracy.

## ATTEMPTED MURDER

■ The first issue before this Court is whether the trial court erred in denying appellant's motion for judgments of acquittal on the attempted murder charges due to insufficiency of the evidence. The appellant argues that the facts presented at trial against the appellant support nothing more than the mere preparation or solicitation by the appellant of a crime and that the state failed to show an overt act performed by the appellant necessary for an attempted murder conviction. The state, however, argues that the evidence presented at trial was sufficient to sustain the appellant's attempted murder convictions.

3. The documents were admitted in evidence based upon the expert's identification of the appellant's handwriting.

4. The court did not permit Mrs. Miller to testify regarding statements Miller made to her, but she did testify regarding the statements she made to him.

■ In syllabus point 2 of *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978) we held that "[i]n order to constitute the crime of attempt, two requirements must be met: (1) a specific intent to commit the underlying substantive crime; and (2) an overt act toward the commission of that crime, which falls short of completing the underlying crime." [5] While it is clear that the appellant had the specific intent to commit the intended murders in this case demonstrated by her own admissions made in the tape recorded conversations with Miller, the appellant argues that she did not commit an overt act toward the commission of the intended murders.

In determining whether the appellant committed an overt act, it is helpful to look to the decision of the New Hampshire Supreme Court in *State v. Kilgus*, 128 N.H. 577, 519 A.2d 231 (1986). The court in *Kilgus* was presented with a closely analogous factual scenario. *See* 519 A.2d at 233.

The court there indicated that while not every solicitation of a crime will constitute an attempt, "[s]olicitation of another to commit murder may constitute an attempt to commit murder when, as in this case, the defendant has completed all the necessary preliminary steps for the hired murder to take place.... This was more than what the defendant calls 'mere' or 'naked' solicitation. It was a 'substantial step' toward the commission of capital murder." *Id.* at 236.

Likewise, the Supreme Court of Alaska addressed whether there was sufficient evidence of an overt act to warrant an attempted murder conviction in *Braham v. State*, 571 P.2d 631 (Alaska 1977), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978). In the *Braham* case, the defendant hired Jeffery Koelzer to kill David Peterson. The defendant apparently

5. The criminal attempt statute found in West Virginia Code § 61–11–8 (1966) essentially classifies the types of attempt and sets forth the penalties for attempt. The provision does provide in pertinent part that "[e]very person who attempts to commit an offense, but fails to commit or is prevented from committing it, shall ... be punished...."

had several conversations with Koelzer in which he offered him $600 to kill Peterson. 571 P.2d at 634–35. Koelzer agreed to commit the murder. *Id.* at 635. The defendant then instructed Koelzer to visit Peterson in the hospital where he was a patient at the time. *Id.* at 637. The purpose of the hospital visit was to get Peterson and Koelzer together to allow Koelzer to gain Peterson's trust and thereby be in a position where he could commit the murder.

The *Braham* court found that there was sufficient evidence presented to the grand jury to uphold the defendant's indictment for attempted murder and to support his jury conviction. Specifically, the court held that while

it is difficult to define precisely the line between preparation and attempt in some cases[,] ... that line can be defined with a reasonable degree of certainty in holding that, in the area of attempt, criminal culpability is present where there is the formation of criminal attempt, a preparation to commit the crime, and a direct unequivocal act toward its perpetration.

*Id.*

Other jurisdictions in similar situations have also found that when an act, whether it be payment of a sum of money, delivery of a weapon, or visiting the scene of the intended crime, accompanies conversation and planning concerning the crime, there exists evidence of an overt act because such combination demonstrates "the seriousness of [the] purpose, and mak[es] the planned crime closer to fruition. *State v. Molasky,* 765 S.W.2d 597, 602 (Mo.1989); *see State v. Mandel,* 78 Ariz. 226, 278 P.2d 413 (1954), *Duke v. State,* 340 So.2d 727 (Miss.1976); *State v. Manchester,* 213 Neb. 670, 331 N.W.2d 776 (1983); *State v. Gay,* 4 Wash.App. 834, 486 P.2d 341 (1971), *review denied,* 79 Wash.2d 1006 (1971); *cf. State v. Otto,* 102 Idaho 250, 629 P.2d 646 (1981) (court found insufficient facts to support defendant's attempted murder conviction where defendant solicited undercover agent to commit murder and paid him $250 with promise of larger sum after the crime was

committed, but took no further steps to bring the plan to fruition).

■ We agree with these other jurisdictions in holding that where formation of criminal intent is accompanied by preparation to commit the crime of murder and a direct, overt and substantial act toward its perpetration, it constitutes the offense of attempted murder.

In the present case, the appellant not only had several conversations with Miller, but gave him $150 to purchase a weapon and $500 as a down payment for the commission of the murders; promised to pay another $550 upon completion of the crimes; gave him a sketch of the crime scene and descriptions of the intended victims; gave him a suicide note and instructed him on how to make the murders look like murder-suicide; instructed him on where to inflict the gun shots; and finally, took Miller and physically showed him the intended victims' home. We conclude that this evidence constitutes more than sufficient evidence to prove that the defendant performed an overt act necessary for the hired murders to occur. Accordingly, we find no error was committed by the lower court in denying the defendant's motion for judgment of acquittal on this matter.

## CONSPIRACY

■ The appellant next argues that for a conspiracy conviction the state must show that the accused agreed with others to commit a crime. The appellant maintains that the state produced no evidence that Miller, while acting as a co-conspirator, ever intended to kill the intended victim. The appellant contends that the state's evidence indicated that the only time Miller intended to kill the victim was when he was a feigned accomplice working with the sheriff's department. Thus, the appellant alleges that the trial court erred in refusing to grant the appellant's judgment of acquittal for these counts. The state, however, maintains that Miller initially agreed to commit the murders when he accepted the $150 from the appellant and that this was established by his wife's testimony. This occurred before he contacted the sheriff

deputies and decided to cooperate with them. Thus, the state asserts there was sufficient evidence at trial to support the conspiracy convictions.

■ West Virginia Code § 61–10–31 (1971) provides, in pertinent part, that "[i]t shall be unlawful for two or more persons to conspire (1) to commit any offense against the State ... if ... one or more of such persons does any act to effect the object of the conspiracy." Moreover, in syllabus point 4 of *State v. Less*, 170 W.Va. 259, 294 S.E.2d 62 (1981) we held that "[i]n order for the State to prove a conspiracy under *W.Va.Code*, 61–10–31(1), it must show that the defendant agreed with others to commit an offense against the State and that some overt act was taken by a member of the conspiracy to effect the object of that conspiracy." *Accord State v. Johnson*, 179 W.Va. 619, 629, 371 S.E.2d 340, 350 (1988).

Similar to the present case, the defendant in the *Kilgus* case was convicted for conspiracy to commit murder. 519 A.2d at 237. The defendant in that case argued that the state failed to prove conspiracy since the "hit man" indicated that he never intended to kill or arrange for the murder of the intended victim's murder. *Id.* The Supreme Court of New Hampshire upheld the conspiracy conviction stating that " '[a] tacit understanding between the parties to cooperate in an illegal course of conduct will warrant a conviction for conspiracy.' " *Id.* (quoting *State v. Gilbert*, 115 N.H. 665, 667, 348 A.2d 713, 715 (1975)).

The evidence presented in the instant case reveals that the appellant contacted Miller about committing the murders. Upon meeting Miller, the appellant gave him $150 to purchase a weapon so that the murders could be committed. Miller, in turn, accepted the $150 thereby implicitly agreeing to perform the crimes. Further,

according to the testimony of Lois Miller, Miller's wife, Miller called her at work around 6:00 p.m. on October 4, 1986, and after his conversation she told him "to quit fooling around, you know, and quit joking with me." Miller called his wife later that evening, around 9:00 p.m., and she told him not to do anything until she got home from work and discussed it. Mrs. Miller testified that when she arrived home, her husband showed her $150 in cash. She then told him to contact the sheriff's department.

It was not until *after* all these events occurred that Miller decided to contact the police at his wife's urging and cooperate with them, presumably for his own benefit.[6]

The jury was instructed that:

Before MARY BURD can be convicted of Conspiracy to commit Murder in the First Degree of Patricia Stone the State of West Virginia must overcome the presumption that she is innocent and prove to the satisfaction of the jury beyond a reasonable doubt that:

(1) the Defendant MARY BURD,

(2) in Wood County, West Virginia,

(3) on or about the __ day of October, 1986,

(4) did conspire with Floyd Miller,

(5) to commit an offense against the State of West Virginia,

(6) to-wit: Murder in the First Degree of Patricia Stone

(7) *while he, the said Floyd Miller, was not then and there a feigned accomplis* [sic]. (emphasis added).

The same instruction was given regarding Aaron M. Stone.

The evidence was sufficient for a jury to conclude under this instruction that the appellant initially agreed with Miller to commit the crime of murder.[7] Therefore,

---

**6.** The prosecuting attorney indicated in his opening statement that Miller was already under indictment at the time he contacted the sheriff's department. The record revealed that Miller was in jail for felonious assault and awaiting trial just prior to his initial meeting with the appellant. The record further reflected that Miller was an habitual criminal having

served time in prison on different occasions for breaking and entering, forgery and false pretense. His criminal record also included two arrests for armed robbery.

**7.** It is important to note that the prosecuting attorney in his closing argument only relied upon Miller's conduct prior to his contact with

we find sufficient evidence existed for the conspiracy convictions and accordingly find no error was committed by the lower court in its denial of the defendant's motion.

## ADMISSIBILITY OF ENTIRE TAPED CONVERSATIONS

■ Finally, the appellant contends that the trial court erred in allowing the jury to consider the acts or declarations of Miller in determining whether a conspiracy existed when Miller refused to testify at trial as to such acts or declarations and when such acts or declarations were not made in furtherance of the conspiracy. The state maintains that Miller's portions of the recorded conversations with the appellant were not admissible as proof of the truth of the matter asserted, but only to explain and give context to the admissions of the appellant.[8]

First, it is undisputed between the parties on appeal that the appellant's recorded statements were properly admitted at trial pursuant to West Virginia Rule of Evidence 801(d)(2)(A).[9] Thus the resolution of this issue centers only upon whether Miller's recorded statements were hearsay and therefore improperly admitted.[10]

■ West Virginia Rule of Evidence 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Consequently, if a statement is not being offered for the truth of the matter asserted but for some other purpose, it is not hearsay and therefore it is admissible. *See* Syl. Pt. 1, *State v. Maynard,* 183 W.Va. 1, 393 S.E.2d 221 (1990).

In the case of *United States v. Gutierrez–Chavez,* 842 F.2d 77 (5th Cir.1988), the Fifth Circuit Court of Appeals addressed whether a co-conspirator's taped statements made after the co-conspirator agreed to assist the police were admissible at trial. *Id.* at 78. The court held that while the statements were not admissible as those of a co-conspirator the "statements are admissible at least as 'reciprocal and integrated utterance(s)' between the two parties, *U.S. v. Metcalf,* 430 F.2d 1197, 1199 (8th Cir. 1970), for the limited purpose of putting the responses of the appellant in context and making them 'intelligible to the jury and recognizable as admissions.' " *Gutierrez–Chavez,* 842 F.2d at 81 (quoting *U.S. v. Lemonakis,* 485 F.2d 941, 948 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 1587, 39 L.Ed.2d 885 (1974)); *see also United States v. Smith,* 918 F.2d 1551 (11th Cir.1990).

Additionally, in *United States v. Davis,* 890 F.2d 1373, 1379–80 (7th Cir.1989) the court found that the defendant's right to

the sheriff's department in arguing for a conspiracy conviction.

**8.** Even the appellant admits that Miller's recorded statements were admissible under this theory as this was the appellant's position at trial when, during defense counsel's argument for a directed verdict he stated that: "The language in the tape with respect to what Mr. Miller says ... is only there to explain what Miss Burd says. This is why you can introduce it without me being able to cross examine Mr. Miller."

**9.** West Virginia Rule of Evidence 801(d)(2)(A) provides in pertinent part that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... his own statement, in either his individual or a representative capacity."

**10.** It is clear that Miller's statements were not admitted as statements of a co-conspirator since his taped statements were made when he was working with the sheriff, and therefore as far as Miller was concerned, his statements were not made during or in furtherance of the conspiracy. *See* W.Va.R.Evid. 801(d)(2)(E). It is also clear that at the time the tape-recorded statements were introduced no objection was made by the appellant nor were any limiting instructions requested. After the statements were introduced, just prior to defense counsel's motion for directed verdict, the defense counsel moved to strike the statements based upon not having the opportunity to cross-examine Miller. Neither the lack of a limiting instructing, nor the lack of an opportunity to cross-examine Miller is the subject of this appeal. The defense counsel tenuously preserved the present assignment of error after the statements had been admitted, during his motion for directed verdict when his argument alluded to the fact that the statements were only admitted to give context to the appellant's admission. Generally, errors must be preserved for appeal by a specific objection or a motion to strike at the time the evidence is introduced. *See* W.Va.R.Evid. 103(a)(1).

confront witnesses was not violated when the trial court admitted tape-recorded conversations between the defendant and a government informant who was not called to testify at the defendant's trial for extortion and racketeering. The Seventh Circuit Court of Appeals found that the government informant's portion of the taped conversation was admissible since his statements were "necessary to place the defendant's statements in a proper context." *Id.* at 1380 (citing *Gutierrez–Chavez,* 842 F.2d at 81; *United States v. Jordan,* 810 F.2d 262, 264 (D.C.Cir.), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1963, 95 L.Ed.2d 535 (1987); *United States v. Price,* 792 F.2d 994, 996–97 (11th Cir.1986); *United States v. Whitman,* 771 F.2d 1348, 1352 (9th Cir.1985)).

The *Davis* court also found that the admission of the informant's statements did not implicate the defendant's right to confront the witness since "the tape recorded statements were admitted for the limited purpose of placing ... [the defendant's] statements in context." *Davis,* 890 F.2d at 1380.

Upon review of the record in this case, we conclude that Miller's tape-recorded statements were not introduced for the truth of the matter asserted or as substantive evidence of the conspiracy as alleged, but were being offered solely to place the appellant's statements in context and make them comprehensible for the jury. Therefore, the admission of these statements for this limited purpose did not implicate the appellant's sixth amendment right to confront witnesses. We therefore find no error was committed by the lower court.

Based upon the foregoing opinion, the judgment of the Circuit Court of Wood County is hereby affirmed.

Affirmed.