697 S.E.2d 117

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Charles J. LIVELY, Defendant Below, Appellant.**

**No. 34856.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 27, 2010.

Decided June 16, 2010.

---

David Schles, Esq., Charleston, WV, for Appellant.

Sidney Bell, Esq., McDowell County Prosecuting Attorney, Welch, WV, for Appellee.

## PER CURIAM:

This case is before the Court upon an Order entered August 11, 2008, by the Circuit Court of McDowell County, West Virginia, resentencing the Defendant, Charles J. Lively, to life with a recommendation of mercy based upon the jury conviction for the felony murder of Dr. Ebb K. ("Doc") Whitley, Jr. The Defendant was also convicted of first degree arson as the underlying felony supporting the felony murder conviction; however, no additional sentence for the arson conviction was imposed by the trial court.[1] The Defendant argues that the trial court erred: 1) by allowing the admission of a statement of a confidential informant because the statement was hearsay and violated the Confrontation Clause; 2) by failing to order the State to disclose to the Defendant the identity of the alleged confidential informant and any exculpatory evidence or information relevant to credibility or for impeachment in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); 3) by allowing the State to admit other crimes evidence under West Virginia Rule of Evidence 404(b), because such evidence created extreme unfair prejudice against the Defendant and had no or only slight probative

---

1. The trial court specifically stated in its Order that it "was not imposing an additional sentence for First Degree Arson because the State presented this case as felony murder."

value; 4) by instructing the jury regarding the concerted action principle because the evidence did not support the theory; 5) by failing to set aside the verdict due to insufficient evidence for the jury to convict the Defendant for first degree arson; 6) by permitting the State to publish a statement of Brian Salyers that, even if portions of it were properly admissible, included irrelevant and improper opinion testimony and discussions of unfairly prejudicial alleged bad acts and character evidence concerning the Defendant, Tommy Owens, and others;[2] and 7) by permitting cumulative errors during the trial which resulted in an unfair trial requiring reversal. Based upon a review of the parties' briefs, their respective arguments, the record, and all other matters before the Court, the decision of the trial court is affirmed.

## I. Facts and Proceedings Below

On March 15, 2005, Dr. Whitley died as a result of asphyxiation due to smoke inhalation and thermal burns over ninety percent of his body[3] that he suffered in a house fire at his residence in Iaeger, West Virginia. Firefighters found his body on the floor by his bed in his second floor bedroom. At the time of his death, Dr. Whitley was seventy years old and was nearly paralyzed, unable to walk and with little use of his hands, after falling in his home in 2000. Despite his physical condition, he by all accounts remained independent and continued to run a pain clinic, which was located next door to his Iaeger residence.

The victim actually had two residences in the Iaeger area, the one in Iaeger where he died, and another located outside of Iaeger on Coon Branch Mountain, where he had been residing with his wife until about a week prior to his death. At that time, Dr. Whitley decided to move out of his Coon Branch home because he was unhappy. Dr. Whitley had informed his sons, Jack and Jeff, that he wanted to move to his Iaeger home. Before his sons returned to Iaeger to move their father, Dr. Whitley moved in with Kathy Lively,[4] the Defendant's mother. Ms. Lively testified that she had worked for Dr. Whitley for twenty-six years and her primary job was his nurse; however, she had also helped care for him. As part of her job duties, Ms. Lively was a signatory on Dr. Whitley's bank account; wrote prescriptions; had the keys to Dr. Whitley's home in Iaeger, the clinic, Dr. Whitley's private office, and the drug sample room; saw patients; and controlled the payroll. There was testimony from another clinic employee, Louise Christian, that Ms. Lively wrote prescriptions for the Defendant, who would frequent the clinic three or four times a week, and she also gave him injections of medications. Ms. Lively also would write prescriptions in her own name and have Ms. Christian give her the medications. Ms. Lively, however, testified that Dr. Whitley had total power at the office and that she would not do anything without his approval.

Additionally, during the week that Dr. Whitley stayed with the Livelys, the Defendant testified that he helped take care of him, including running errands for him, pre-

---

**2.** This argument regarding the publishing of Mr. Salyers' statement to the jury was not made in the Defendant's Petition for Appeal, but was raised for the first time in his Appellant's Brief. To the extent that the Defendant failed to raise the issue in his Petition for Appeal as an assignment of error, the argument regarding this issue is deemed waived and will not be considered by the Court in this appeal. See Koerner v. West Virginia Dep't of Military Affairs & Pub. Safety, 217 W.Va. 231, 617 S.E.2d 778 (2005) (refusing to consider an argument in appellant's brief that was not assigned as error in petition for appeal). Additionally, even though the Defendant raises the issue in his brief, it is mentioned only in passing within the Defendant's argument regarding an improper jury instruction and is wholly unsupported by any legal authority. See State v.

LaRock, 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal.").

**3.** The Deputy Chief Medical Examiner testified that his findings regarding the cause of death were consistent with an intense fire burning near, but not directly contacting Dr. Whitley's body.

**4.** At the time of trial, Ms. Lively had married and was Kathy Lively Hamilton. For purposes of this opinion, she will be referred to as Ms. Lively.

paring meals for him, and sitting with him. According to the Defendant, Dr. Whitley agreed to pay the Defendant fifty dollars a week, so the Defendant quit his logging job.

The weekend prior to Dr. Whitley's death, just several days after he moved into Kathy Lively's home, Dr. Whitley's sons returned to move him to his home in Iaeger. Jack stated that his father was upset and anxious when he arrived at the Lively home, while Jeff stated that his father looked scared. He testified that his father did not have any type of close relationship with the Defendant. Instead, according to Jack, his father told him that he was glad to get away from the Lively home, because Dr. Whitley and the Defendant had "got into it," and Dr. Whitley was afraid that the Defendant was going to hit him.

In conjunction with moving their father back to Iaeger, Dr. Whitley's sons contacted Sherry Addair and arranged for her to move in to the home with their father and take care of him. Ms. Addair was expected to come to the home either Tuesday night, March 15, or Wednesday morning, March 16.

While Jack left to return to his home on Sunday, after moving his father into his Iaeger home, Jeff remained until Monday, March 14. Prior to Jeff's leaving on Monday, Dr. Whitley reassigned the administrative duties at his clinic, removing Ms. Lively's name from the clinic's bank accounts,[5] taking her keys, and prohibiting her from writing prescriptions without them being initialed by Ms. Christian. Ms. Lively and Dr. Whitley got into a heated argument at the doctor's home, in front of Jeff, Ms. Christian, and the local bank president, Jim Sizemore. Even though the evidence was that Ms. Lively and the doctor were known to argue, on this occasion, both Jeff and Ms. Christian testified that Ms. Lively threatened Dr. Whitley, stating "I'll kill you, you SOB[,]" and that "he wasn't going to do this to her. . . . She'd took care of him for 25 years. And that she'd kill him, that he wasn't going to do this." Ms. Lively, however, testified that she never threatened to kill Dr. Whitley

and that Dr. Whitley's reassignment of all of her administrative duties, including having to have all prescriptions she wrote initialed by another employee did not bother her in the least.

Before Jeff left to return to his home, he asked both Ms. Christian and Shirley Cline, another employee of the clinic, to bring breakfast and check on his father on Tuesday morning, March 15. Ms. Christian was the last person to see the doctor on Monday evening. She left his home about 7:00 p.m. and locked the front door. The testimony was that Ms. Lively was one of only a few people that knew that Dr. Whitley would be alone on Monday evening. Also, Ms. Lively knew that Dr. Whitley had no phone service in his home as the phone company had not yet reestablished service.

During the trial, Tim Butler testified that he was driving to work the next morning between 8:00 a.m. and 8:15 a.m., when he passed Dr. Whitley's house as he did every morning. Mr. Butler stated that he "glanced" at the doctor's home and noticed that the front door was open and a person was inside the house. Mr. Butler could not describe or identify the individual he saw.

When Ms. Christian drove past Dr. Whitley's home on the morning of the fire on her way to work around 9:00 a.m., she did not see smoke coming out of the house, or any other sign of fire at the doctor's home. Because there were already patients at the clinic when she arrived, she did not immediately take breakfast to Dr. Whitley. Between 9:00 a.m. and 9:30 a.m., Ms. Lively called into work and asked if anyone had checked on Dr. Whitley. Ms. Lively stated that she was not coming into work because she was going to the doctor about a back problem. The Defendant also called into the clinic that morning to see if Dr. Whitley was going to need him to take care of him that day. Ms. Christian testified that it was the first time that the Defendant had ever called the clinic asking about Dr. Whitley. Shirley Cline, the employee who took the call from the Defendant, interrupted the conversation to report

5. This was not the first time that Dr. Whitley had removed Ms. Lively's name from the bank ac-

counts according to the evidence.

that the doctor's house was on fire. About the same time, Ms. Christian noticed that smoke was coming out of the doctor's house. The fire was reported to McDowell County 911 at 10:17 a.m.

When firefighters arrived, the front door, which had been locked the night before, was unlocked. There were no signs of forced entry. While repeatedly suggested by the defense that the cause of the fire at Dr. Whitley's was a cigarette, as he was a smoker, two assistant state fire marshals testified that there were two separate fires that were intentionally set in Dr. Whitley's home—one downstairs and one in the doctor's bedroom. Further, a sample taken from the hole that burned through the floor in Dr. Whitley's bedroom revealed the presence of an ignitable liquid, which was later identified at the State Police Laboratory as toluene.[6] The testimony from the State Fire Marshall's Office was unequivocal that neither fire had been started by a cigarette.

The investigation of the fire also revealed that a television set had been knocked off an entertainment center and was face down. Further, Dr. Whitley's wheelchair was not next to his bed where it had been left the night before.

After Dr. Whitley's body was found, the Defendant and his mother's boyfriend, Mike Stafford, went to the doctor's Coon Branch Mountain home to inform his wife, Sue Whitley, of his death. Mrs. Whitley testified that when the Defendant arrived, he was "really energetic and started picking up things, cleaning up. . . . He went in all the rooms[.]" Mrs. Whitley stated that "[h]e had a garbage bag and was putting things in it he said was trash." There was a safe in a bedroom that the Defendant went into and there was also a laptop computer and printer. After the Defendant left the house, Mrs. Whitley noticed that the computer and printer were missing. She was later informed that the sheriff's department had recovered the laptop computer from someone to whom the Defendant had sold it.

The testimony at trial revealed that the Defendant had attempted to pawn a laptop computer the very same day it went missing from Dr. Whitley's Coon Branch home. The first potential buyer did not want the computer after seeing Dr. Whitley's name was on the start up screen. The Defendant then took the computer to his cousin, who removed the doctor's name from the screen. The Defendant then sold the computer to Jeremy Lester for either $150 or $250. After the sale, the Defendant phoned Mr. Lester and told him that if anyone asked about the computer that it was Dr. Whitley's, but the doctor had given it to him. Mr. Lester turned the computer over to police the next evening.

A couple of weeks later, McDowell County Deputy Sheriff Ronald Blevins learned from an informant, who insisted that his name not be disclosed, that the informant had seen Tommy Owens near the Whitley Clinic on the morning of the fire. The informant also provided authorities with a description of the vehicle that was seen near the clinic the morning of the fire. Based upon this tip obtained during the course of the investigation, which did not implicate the Defendant, the deputy questioned Tommy Owens. Tommy Owens told the deputy that he had been with Brian Salyers the morning of the fire.

Mr. Salyers, in turn, voluntarily submitted to be questioned by law enforcement. Initially, Mr. Salyers stated that he had no knowledge about Dr. Whitley's death, but after being interviewed for about two hours, Mr. Salyers changed his position and began relating information about Dr. Whitley's death. Specifically, Mr. Salyers stated that he had picked up both Mr. Owens and the Defendant around 7:00 a.m. on the morning of the fire. The two asked Mr. Salyers to give them a ride to Dr. Whitley's clinic. The deputy testified that Mr. Salyers acted afraid before Mr. Salyers began implicating the Defendant during the interview. Deputy Richard Keith Auville also testified that Mr. Salyers expressed that he was fearful of both Mr. Owens and the Defendant and what

---

**6.** The testimony was that toluene is found in paint thinners, gasoline, charcoal starters, and some floor strippers.

would happen to him if they found out what he had told the police. Consequently, while Mr. Salyers was with the sheriff's deputies the day he gave his statement, Deputy Auville testified that he spent a couple of hours trying to find Mr. Salyers a place with his family where he could go for his safety. Finally, during the interview, Mr. Salyers admitted to stealing copper, selling stolen copper wiring on the same day he had given Mr. Owens and the Defendant a ride, and using the money on drugs. The authorities corroborated the portions of his statement regarding the sale of stolen copper wiring by interviewing the man who operated the scrap metal junk yard. At trial, however, while admitting all other portions of his statement, Mr. Salyers recanted the portion of his statement in which he had admitted to giving the Defendant and Mr. Salyers a ride to Dr. Whitley's clinic. Mr. Salyers admitted that he had known the Defendant his whole life and had spoken with him since the Defendant had been charged with the crimes against the doctor, including going to lunch with the Defendant and his family.

Additionally, Jason Ritchie, an inmate in the regional jail, testified for the State. Mr. Ritchie stated that the Defendant told him that his mother had worked for Dr. Whitley. Mr. Ritchie also testified that the Defendant told him that the Defendant and Mr. Owens went to Dr. Whitley's home to steal money and drugs but, instead, took a safe, computer, and a gun. As they were leaving, the Defendant told Mr. Ritchie that Mr. Owens set Dr. Whitley's home on fire.

Lastly, the State put on evidence pursuant to West Virginia Rule of Evidence 404(b). The trial court gave two cautionary, limiting instructions at the time the Rule 404(b) evidence was being admitted and again instructed the jury in the Court's final charge at the request of the State.[7] This evidence was offered by the State and ultimately admitted to show common scheme, plan and intent after an approximately two-hour in camera *McGinnis*[8] hearing. The State pursued a concerted action theory for the charge of first degree murder against the Defendant. The Rule 404(b) evidence that was admitted by the trial court included: 1) evidence about an October 6, 2002, fistfight at a Friendly Mart Store in Panther, West Virginia, in which the Defendant and Tommy Owens attacked two individuals, including a disabled coal miner, resulting in a misdemeanor battery conviction for the Defendant; 2) evidence relating to an arson attempt on Stacy's Variety Store perpetrated by the Defendant and Mr. Owens in exchange for money and/or drugs, which occurred in January 2001; and 3) evidence relating to the theft of Dr. Whitley's laptop computer by the Defendant from his Coon Branch home on the afternoon of his death.[9]

The Defendant offered evidence of an alibi. The Defendant also testified that he did not commit the crimes with which he was charged. Regarding his alibi, both Mike Stafford and his mother, Calos Stafford, testified that on March 15, 2005, the morning of the fire, the Defendant was at Mike's house, which was next to his parents' home, and that the Defendant had spent the night at Mike's home. They both testified that the Defendant did not leave until after he was informed by a telephone call that Dr. Whitley's home was on fire. Upon cross-examination by the State, however, Mr. Stafford tes-

---

7. In the Petition for Appeal, the Defendant argued that the trial court failed to give the jury a cautionary, limiting instruction concerning Rule 404(b) evidence. The Defendant, in his appellate brief, which was filed by new counsel, abandons the argument that no instructions were given; however, the Defendant still maintains that the trial court failed to give "appropriate limiting instructions." The Court summarily rejects this argument as the record unequivocally reveals that the trial court instructed the jury twice during the trial prior to admitting the Rule 404(b) evidence. The trial court also instructed the jury during the general charge at the request of the State.

8. See *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

9. The State also pursued the admission of evidence under West Virginia Rule of Evidence 404(b) relating to an incident in which Mr. Owens stole between $1200 and $1400 from a lady after putting duct tape around her head, face, nose and mouth. The trial court, however, refused to allow this evidence to be admitted at trial because of the lack of any connection to the Defendant.

tified that he had taken a sleeping pill the night before the fire at Dr. Whitley's. Also, Ms. Stafford testified that her son, Mike, came down to her house the morning of the fire after 9:00 a.m. and that he had just gotten out of bed because he still was in his pajamas. Ms. Stafford did not see the Defendant that morning until after she saw her son. She agreed that if the evidence was that the fire was not reported until after 10:00 a.m. that morning, then she did not see the Defendant until that time as the Defendant told them about the fire. She testified that it takes about fifteen or twenty minutes to get to Iaeger from her home.

The defense also introduced evidence from an investigator for an insurance company who classified the fire as undetermined, because he could not determine a single point of origin of the fire. His investigation occurred nine days after the fire and he testified that by classifying it as undetermined, he did not rule out that it was arson and he did not rule out that it was accidental.

The defense further offered the testimony of Harry Caskey, another inmate, who was in jail at the same time as both the Defendant and Mr. Ritchie. This witness testified that Mr. Ritchie told him that to get out of jail, "[a]ll you've got to do is tell them that the Lively boy said he killed that Doc." Further, the defense thoroughly cross-examined all the State's witnesses and brought to the jury's attention the inconsistencies in Mr. Ritchie's testimony, including his statement that the Defendant had stated that he beat Dr. Whitley prior to setting the fire. There were no signs of trauma on the victim's body. Mr. Ritchie also stated that the Defendant told him that he and Mr. Owens took a big safe from the house and a gun; however, the safe from the Iaeger home was still there.

The charges of first degree murder and first degree arson against the Defendant went to the jury.[10] After several hours of deliberations, the jury found the Defendant guilty of first degree felony murder and first degree arson, which was the underlying felo-ny. The jury recommended mercy and the Defendant was sentenced to life with mercy and a consecutive one year sentence for petit larceny. This appeal ensued.

## II. Standard of Review

As the Court has previously stated:

In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). Applying these standards of review, the Court now examines the issues presented in the present appeal.

## III. Discussion of Law

### A. Confrontation Clause and Hearsay

The first assignment of error concerns two statements. The first statement was made by a confidential informant whose identity was not disclosed to the Defendant. Specifically, the statement at issue arises from Deputy Blevins' testimony that a confidential informant reported to police that he saw Mr. Owens in Mr. Salyers' truck near Dr. Whitley's clinic the morning of the fire. Importantly, the confidential informant's statement was not admitted into evidence. Instead, the deputy testified that the information given to him by the confidential informant was the reason he sought to interview Mr. Owens and Mr. Salyers.

The second statement that the Defendant now contends was erroneously admitted during trial was that of jail inmate, Michael Cline, reporting to the police statements made to him by fellow inmate Jason Ritchie wherein Mr. Ritchie alleged the Defendant inculpated himself in the crimes against Dr. Whitley. Once again, no statement of Mr.

---

**10.** The Defendant also was indicted for burglary, grand larceny and conspiracy to commit murder and arson. Before trial, the Defendant pleaded guilty to petit larceny, a lesser-included offense of grand larceny, for stealing Dr. Whitley's laptop. The State voluntarily dismissed the burglary and conspiracy counts prior to the case going to the jury.

Cline was admitted into evidence. Nor was what Mr. Cline reported to police admitted for the truth of the matter asserted. In fact, the only statements of Mr. Ritchie which were testimonial in nature were those admitted via Mr. Ritchie's own testimony.

■ It is also significant that there was no objection made by the Defendant at the time the deputy testified about the information given to him about seeing Mr. Owens at the Whitley residence nor was there an objection to Mr. Ritchie's testimony that Mr. Cline reported his statements to the police. Moreover, there was no other record developed below by the Defendant regarding the testimony of Deputy Blevins or the testimony of Mr. Ritchie violating the Confrontation Clause of the Sixth Amendment.[11] Despite the lack of any objection or argument below regarding a violation of the Confrontation Clause of the Sixth Amendment, the Defendant now argues on appeal that the statement made by the confidential informant to the police was "testimonial" in nature and violated the Confrontation Clause. *See State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006). The State, however, argues that the statements at issue were not "testimonial" in nature, were not hearsay, and did not violate the Confrontation Clause.

■ At the outset, the Court finds that this assignment of error was not properly preserved by the Defendant below. When reference was made during trial to these two statements, there were no objections by the Defendant. Further, the Defendant did not complain before the trial court of any viola-

tion of the Confrontation Clause. The Court consistently has held that "silence may operate as a waiver of objections to error and irregularities at the trial which, if seasonably made and presented, might have been regarded as prejudicial." *State v. Grimmer*, 162 W.Va. 588, 595, 251 S.E.2d 780, 785 (1979), *overruled on other grounds, State v. Petry*, 166 W.Va. 153, 273 S.E.2d 346 (1980). The raise or waive rule is designed "to prevent a party from obtaining an unfair advantage by failing to give the trial court an opportunity to rule on the objection and thereby correct potential error." *Wimer v. Hinkle*, 180 W.Va. 660, 663, 379 S.E.2d 383, 386 (1989). In *LaRock*, this Court explained as follows:

> Our cases consistently have demonstrated that, in general, the law ministers to the vigilant, not to those who sleep on their rights.... When a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time. The pedigree for this rule is of ancient vintage, and it is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. There is also an equally salutary justification for the raise or waive rule: It prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurtur-

---

11. During the hearing on the Defendant's "Motion for Post–Verdict Judgment of Acquittal or Motion for a New Trial," the Defendant argued for the first time that the name of the confidential informant that made the initial report about seeing Mr. Salyers and Mr. Owens near Dr. Whitley's home should have been given to the defense. Even then, no Confrontation Clause or hearsay argument was raised. Rather, the Defendant's argument was that the State's failure to produce the identity of the confidential informant was a failure to disclose *Brady* material, therefore warranting a judgment of acquittal. Although the assignments of error in the Petition for Appeal raise Confrontation Clause and hearsay issues, they do no raise a *Brady* issue. However, the Defendant's brief contains a *Brady* argument.

The State responded during the hearing on the Defendant's post-trial motion that

> [w]ith respect to the allegation that the conviction should be reversed because of *Brady* materials, as the Court knows, persons sometimes speak to the police with the guarantee that they will remain anonymous. That's a common practice, and they have a right to have their identity protected, and that was just information that the police acted on to continue their investigation, and certainly, that was not the evidence that resulted in the conviction in this case.

After a hearing on the post-trial motion, the trial court denied the Defendant's motion.

ing the seed as a guarantee against a bad result). In the end, the contemporaneous objection requirement serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

196 W.Va. at 316, 470 S.E.2d at 635.

■ Although the Defendant does not ask the Court to notice plain error, the Court can sua sponte apply the plain error doctrine if the record below is sufficient for such analysis. *State v. Hutchinson,* 176 W.Va. 172, 177, 342 S.E.2d 138, 142 (1986) ("[W]e may, *sua sponte,* in the interest of justice, notice plain error[.]"). To that end, "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995); *State v. Spence,* 182 W.Va. 472, 481, 388 S.E.2d 498, 507(1989)("The plain error rule presupposes that the record is sufficiently developed to discern the error.").

■ The record in the instant case is fully developed, in that it reflects clearly the matters to which the Defendant now objects, as well as the specific testimony at issue. Further, where there is a serious criminal conviction (e.g. first degree murder as in the instant case) and an issue of constitutional magnitude, it behooves the Court to conduct a plain error analysis on appeal, rather than dragging the proceedings out over many ensuing years. Consequently, a plain error analysis of the issues involving these statements will be performed. Step one in such analysis is that an error must have occurred during the trial.

The substance of the first statement at issue, that of the confidential informant, merely reflected that a Mr. Owens was seen at Dr. Whitley's residence the morning of the fire. The deputy who referred to the statement in his testimony did so only to explain the reason that he went to interview Mr. Owens. The information from the confiden-

tial informant did not implicate the Defendant in any manner.

The second statement was nothing more than Jason Ritchie's testimony that he told Mr. Cline about the Defendant's admissions to him (Ritchie), and that it was Mr. Cline who told the police.

As stated earlier, neither of the statements at issue were offered as evidence at trial. Nor were the references to either by trial witnesses offered to prove the truth of the matter asserted. The first was offered to explain why law enforcement took the action to go and interview Mr. Salyers in conjunction with the investigation of the victim's death. The second were mere gratuitous comments by an inmate witness as to how he believed the police learned of his statements. *See* Syl. Pt. 1, in part, *State v. Maynard,* 183 W.Va. 1, 2, 393 S.E.2d 221, 222 (1990) (holding, in part, that "[g]enerally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent, state-of-mind, identification or reasonableness of the party's action...."). Under these circumstances, there was no error and no violation of the Confrontation Clause. Absent a finding of error, it is not necessary to proceed to the other steps of the plain error analytical framework. It is clear that the testimonial references to out-of-court statements had no adverse effect on the substantial rights of the defendant; and in no way adversely affected the fairness, integrity, or public reputation of the judicial proceedings in the proceeding below, the Court will not apply the plain error doctrine to this case.

Finally, the Defendant also assigned as error in his brief (but not in his Petition for Appeal) the State's failure to disclose alleged exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As previously mentioned, the *Brady* issue was raised for the first time below in the post-trial motion. This argument was made in conjunction with the "failure" [12] of the State to provide the confidential

---

**12.** Because the Defendant never requested the

identity of the confidential informant until after

informant's name. There has been no assertion at any time by the Defendant that anything in the informant's statement would in any way tend to exculpate the Defendant. To the extent that the Defendant failed to raise the *Brady* issue in his Petition for Appeal as an assignment of error, and failed to develop the record regarding the issue, the argument is deemed waived and the Court is not required to consider this issue. *See Koerner*, 217 W.Va. 231, 237, 617 S.E.2d 778, 784 ("Rule 3(c) of the Rules of Appellate Procedure in the Court requires a petition for appeal to set forth the 'assignments of error relied upon on appeal....'" "... *Holmes v. Basham*, 130 W.Va. 743, 45 S.E.2d 252, 258 (1947) (the Court refused to consider an argument in an Appellant's brief that was not assigned as an error in the petition for appeal.); *Tiernan v. Charleston Area Medical Center, Inc.*, 203 W.Va. 135, 506 S.E.2d 578, 583, n. 10 (1998) ('Issues not raised on appeal ... are deemed waived.'); 18 Michie's Jurisprudence, Appeal and Error § 210, p. 400, n. 15.").

However, just as was the case with the Confrontation Clause, given the constitutional significance of a *Brady* issue, the Court can sua sponte conduct a plain error analysis if the record is sufficient to do so. *Miller*, 194 W.Va. 3, 459 S.E.2d 114, Syl. Pt. 7. The deputy testified that the information provid-

ed by the confidential informant related solely to the possible presence of Mr. Owens at the scene and possibly to a vehicle at the scene the morning of the fire. More importantly, as previously discussed, the information provided to the police by the confidential informant included nothing regarding the Defendant. Thus, the Court concludes that the record is sufficient to conduct a plain error analysis; and determines that even had the Defendant raised the alleged *Brady* issue in a timely manner, the failure to provide the identity of the confidential informant did not constitute error. No error having been found, it is unnecessary to perform the additional steps of a plain error analysis.

### B. Rule 404(b) Evidence

■ The Defendant argues that the trial Court improperly allowed evidence under West Virginia Rule of Evidence 404(b)[13] to be admitted. The evidence at issue[14] included: 1) the Defendant and Mr. Owens attack of and fistfight with two other men, one of whom was a disabled coal miner, in October of 2002, which was prior to the charged fire; 2) the Defendant and Mr. Owens involvement with an alleged attempted arson in January of 2001; and 3) the Defendant's theft of a laptop computer belonging to Dr. Whitley on the same day as the arson that destroyed Dr. Whitley's home.[15] The Defendant argues

---

the trial was over, the Defendant's use of the word "failure" is an inaccurate characterization.

**13.** West Virginia Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

*Id.*

**14.** The Defendant also includes in the Rule 404(b) argument "evidence of illegal drug activity." The Defendant states that "[t]he State did

not give notice that it intended to introduce any evidence purported [sic] to show Jason Lively was involved in drug activity." The Defendant, however, points to no specific evidence offered by the State regarding "illegal drug activity" by the Defendant. Rather, the Defendant argues that the State "insinuate[d]" the Defendant's alleged involvement in such activity. The "illegal drug activity" evidence was not presented in the Petition for Appeal and there were no objections at trial to such testimony. "'Errors assigned for the first time on appeal will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court had objection been raised there.' Syl. Pt. 17, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974)." *State v. Dennis*, 216 W.Va. 331, 350, 607 S.E.2d 437, 456 (2004).

**15.** The Defendant was convicted of assault and battery in magistrate for his part in the fistfight; the Defendant pleaded guilty to conspiracy to commit arson regarding the attempted arson evidence; and the Defendant pleaded guilty to the theft of the laptop computer.

that the "vast volume of evidence"[16] was irrelevant and unfairly prejudiced him and confused the issue. The State conversely argues that the evidence was properly admitted to show motive, intent and common scheme or plan.

■ The Court reviews the circuit court's decision to admit evidence pursuant to West Virginia Rule of Evidence 404(b) under the following standard of review:

[t]he standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

*State v. LaRock,* 196 W.Va. 294, 310–11, 470 S.E.2d 613, 629–630 (1996). The Court further stated in *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994), however, that

[o]ur function on . . . appeal is limited to the inquiry as to *whether the trial court acted in a way that was so arbitrary and irrational that it can be said to have abused its discretion.* In reviewing the admission of Rule 404(b) evidence, we review it in the light most favorable to the party offering the evidence, in this case the prosecution, maximizing its probative value and minimizing its prejudicial effect.

193 W.Va. at 159, 455 S.E.2d at 528 (emphasis added).

■ In *McGinnis,* this Court held in syllabus points one and two that:

When offering evidence under Rule 404(b) of the West Virginia Rules of Evidence, the prosecution is required to iden-

tify the specific purpose for which the evidence is being offered, and the jury must be instructed to limit its consideration of the evidence to only that purpose. It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in Rule 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record and that purpose alone must be told to the jury in the trial court's instruction.

Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin,* 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

**16.** The Defendant suggests that the trial court improperly allowed fourteen witnesses to testify regarding the Rule 404(b) evidence. This Court's review of the entire trial transcript reveals that the State methodically presented, through these witnesses, the manner in which the Defendant was involved with the prior crimes evidence. Each witness who testified helped to complete the story of the Defendant's involvement in the prior crimes and was not simply repeating the same story. There is no limitation either in case law or within Rule 404(b) regarding the number of witnesses who may be permitted by the trial court to testify regarding evidence deemed admissible by the trial court under Rule 404(b). W. Va. R. Evid. 404(b).

193 W.Va. at 151, 455 S.E.2d at 520, Syl. Pts. 1 and 2.

 Applying the foregoing legal principles to the Rule 404(b) evidence that was admitted during the Defendant's trial, it is undisputed that the State properly filed a detailed notice of intention to introduce the evidence at issue pursuant to West Virginia Rule of Evidence 404(b). Further, the trial court conducted a two-hour in camera hearing on November 6, 2006, and made specific findings on the record that the State had proven by a preponderance of the evidence that the subject "crimes, wrongs, or acts" had occurred and that the State was offering the evidence for a permissible purpose within the confines of West Virginia Rule of Evidence 404(b). Specifically, the trial court found that the evidence of the stolen laptop was properly being offered to prove motive, plan and intent; the evidence of the Defendant and Mr. Owens attacking two individuals, one of whom was a disabled coal miner, and engaging in a fistfight against them, was properly being offered to show common scheme or plan of the Defendant and Mr. Owens to act in concert with one another to carry out crimes of violence;[17] and the evidence of the Defendant's and Mr. Owens' attempt to commit arson of building using beer bottles filled with kerosene, gasoline, or some other fuel was properly admitted to show common scheme or plan of the Defendant and Mr. Owens to act together in carrying out crimes of violence.[18] The trial court also determined that the evidence was more probative than prejudicial to the Defendant. Additionally, the trial court properly gave two cautionary instructions to the jury regarding the evidence at the time it was being offered by the State, and instructed the jury on the same issue during the general charge to the jury at the request of the State.

 As the Court stated in syllabus point three of *LaRock,*

It is presumed a defendant is protected from undue prejudice if the following requirements are met: (1) the prosecution offered the evidence for a proper purpose; (2) the evidence was relevant; (3) the trial court made an on-the-record determination under Rule 403 of the West Virginia Rules

---

17. It is important to note that the Defendant maintained at the post-trial motions hearing that the evidence admitted pursuant to West Virginia Rule of Evidence 404(b) was offered solely for the State's conspiracy charge. The Defendant argued that when the State dismissed the conspiracy count against the Defendant, the Rule 404(b) evidence became unfairly prejudicial to the Defendant, thereby warranting either a judgment of acquittal or a new trial. This argument, however, completely ignores the fact that the State offered the Rule 404(b) evidence that involved Mr. Owens, not just for the conspiracy count, but to show the State's theory of concerted action between Mr. Owens and the Defendant. In *State v. Fortner,* 182 W.Va. 345, 387 S.E.2d 812 (1989), the Court held in syllabus point 11 that "[u]nder the concerted action principle, a defendant who is present at the scene of a crime and, by acting with another, contributes to the criminal act, is criminally liable for such offense as if he were the sole perpetrator." *Id.* at 349, 387 S.E.2d at 816, Syl. Pt.11. This theory of the case used by the State is different than a conspiracy. " 'In order for the State to prove a conspiracy under *W. Va.Code,* 61–10–31(1), it must show that the defendant agreed with others to commit an offense against the State and that some overt act was taken by a member of the conspiracy to effect the object of that conspiracy.' Syl. Pt. 4, *State v. Less,* 170 W.Va. 259, 294 S.E.2d 62 (1981)." Syl. Pt. 3, *State v. Burd,* 187 W.Va. 415,

419 S.E.2d 676 (1991). Consequently, the Rule 404(b) evidence was equally relevant to both the concerted action principle theory used by the State and the conspiracy charge against the Defendant. Thus, the evidence became no less relevant or admissible simply because the conspiracy charge was dismissed by the State.

18. During the *McGinnis* hearing, the Defendant argued that both the fistfight and the attempted arson were too remote to be admissible in the instant case. While not directly assigning as error in the instant appeal, the Defendant argues before this Court that the fistfight that occurred two and one-half years prior to the victim's murder, and the attempted arson that occurred a little over four years before the victim's murder, were too remote to be admissible under West Virginia Rule of Evidence 404(b). "As a general rule remoteness goes to the weight to be accorded the evidence by the jury, rather than to admissibility." Syl. Pt. 6, *State v. Gwinn,* 169 W.Va. 456, 288 S.E.2d 533 (1982); *see State v. Winebarger,* 217 W.Va. 117, 617 S.E.2d 467 (2005) (holding that where defendant was charged with first degree murder and was ultimately found guilty of voluntary manslaughter, other crimes evidence that defendant had brandished a weapon on other occasions five to fifteen years prior to the date in question was admissible to demonstrate defendant's intent and the absence of accident or mistake).

of Evidence that the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) the trial court gave a limiting instruction. 196 W.Va. at 299, 470 S.E.2d at 618, Syl. Pt. 3. In the instant case, all of the requirements of *LaRock* were met by both the prosecution and the trial court. Consequently, the Court finds no error in the trial court's decision to admit certain evidence of the Defendant's prior criminal conduct under the provisions of West Virginia Rule of Evidence 404(b). *See State v. Newcomb*, 223 W.Va. 843, 679 S.E.2d 675 (2009)(upholding admissibility of evidence under West Virginia Rule of Evidence 404(b) where all factors of *McGinnis* were followed by trial court).

### C. Concerted Action Principle

The Defendant next complains that the trial court erroneously instructed the jury regarding the concerted action principle. The Defendant asserts that there were no facts which showed a principle in the first degree set the fire and that the Defendant was present and in some manner aided, encouraged, assisted or incited the first degree principle. The State did not respond to this particular issue.

 The Court has established the following standards of review applicable to jury instructions:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the spe-

cific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Syl. Pt. 4, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Further, "the question of whether a jury was properly instructed is a question of law, and the review is *de novo.*" Syl. Pt. 1, *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 (1996). Applying these principles, the Court addresses the Defendant's alleged error regarding the concerted action principle instruction.

 The trial court instructed the jury as follows, over the Defendant's objection:

The Court instructs the jury that under our law, each and every person who is actually present at the scene of the commission of a criminal felony act and who participates in the commission of such act in any way, whether it be by directly doing the act or it be by encouraging, enticing, lending countenance to, or otherwise aiding the commission of the crime in any manner can be found guilty of a criminal offense and punished for it. The law calls this the concerted action principle.

Under concerted action principle, a defendant who was present at the scene of a crime and who by acting with one or more other persons contributed in any way to the commission of such criminal act is criminally liable for the crime the same as if he or she were the sole perpetrator.

The Defendant acknowledges that the foregoing instruction was an accurate statement of the law. He only challenges whether the facts supported the trial court giving the instruction.

A review of the facts in this case reveals ample evidence was offered during trial to support the trial court giving the State's instruction on concerted action principle. The State offered the testimony of Jason Ritchie,[19] who testified that the Defendant

---

**19.** While there were inconsistencies in Mr. Ritchie's testimony, including the manner in which Dr. Whitley was murdered, those inconsistencies were brought out by the Defendant in cross-examination. The Defendant further brought out that Mr. Ritchie had received a favorable plea agreement in exchange for his testimony. Finally, the Defendant offered the testimony of Harry Caskey, another inmate, who stated that Mr. Ritchie boasted that all one had to do get out of jail was to tell them that the Defendant killed Dr. Whitley.

discussed the crimes he committed against the victim with him. Mr. Ritchie stated that the Defendant told him that he and Mr. Owens went to Dr. Whitley's home to rob him and that Mr. Owens set fire to the house as they were leaving. Dr. Whitley died from smoke inhalation and burns to his body. The Defendant further told Mr. Ritchie that he stole a computer from Dr. Whitley. Additionally, Mr. Salyers gave a statement to police that he had picked up both Mr. Owens and the Defendant around 7:00 a.m. or a little after on the morning of the fire. The two asked Mr. Salyers to give them a ride to Dr. Whitley's clinic the morning of the fire, which Mr. Salyers did.[20] Finally, there was evidence submitted pursuant to Rule 404(b) which demonstrated that Mr. Owens and the Defendant had a common scheme of committing violent crime, including starting a fistfight and attempted arson.

Based upon the foregoing, the Court concludes that there was sufficient evidence warranting the trial court giving the State's instruction regarding concerted action principle to the jury.

### D. Sufficiency of Evidence

The Defendant argues that there was insufficient evidence offered by the State to convince the jury beyond a reasonable doubt that the Defendant was guilty of arson. The Defendant further asserts that if the arson conviction fails, the murder conviction also must fail, because the State proceeded on a felony murder theory with arson as the underlying felony. In contrast, the State argues that the evidence was sufficient to support the jury's verdict.

The trial court, in rejecting the Defendant's motion for acquittal, found that

we had a lengthy trial ... and both sides presented and was allowed to present what I considered to be—each side had an opportunity to get their position to the jury in this case, and it's the jury that decides whether or not they have sufficient evidence after hearing the case. We instruct them ... that the State of West Virginia

has the burden of proof to prove its case beyond a reasonable doubt.

In this case, the jury indicated by its verdicts as to the first degree murder case and the first degree arson case, indicated by their verdicts that all 12 of them felt that the State had presented enough evidence to meet its burden of proof beyond a reasonable doubt.

. . .

This really was just a case for the jury to decide, which in any trial, for them to, first, assess the evidence to determine in their mind who's telling the truth and who's not telling the truth, and then look at the rest of the evidence and make a decision on guilt or not guilt. In this instance, they decided that he was guilty beyond a reasonable doubt.

The Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence. *LaRock*, 196 W.Va. at 304, 470 S.E.2d at 623. As this Court has further explained:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Guthrie*, 194 W.Va. at 663, 461 S.E.2d at 169, Syl. Pt. 1.

Moreover,

criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have

---

**20.** Mr. Salyers recanted the portion of his statement at trial regarding giving Mr. Owens and the Defendant a ride to Dr. Whitley's clinic the morning of the fire.

drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part.

Utilizing the foregoing standards, we now examine whether there was sufficient evidence to support the Defendant's conviction, keeping in mind that for the purposes of this analysis, all the evidence must be viewed in the light most favorable to the prosecution. *Id.*

The State offered evidence that the victim died of smoke inhalation and thermal burns over ninety percent of his body as a result of two intentionally set fires at Dr. Whitley's home. There was a sample taken from the hole that burned through the floor at his home that which revealed the presence of an ignitable liquid.

As evidence of motive, the evening before the fire, the Defendant's mother, Ms. Lively, engaged in a heated argument with Dr. Whitley and threatened to kill him because he had taken her office keys, removed her name from the checking accounts, and ordered that she not write any more prescriptions. There was testimony from another clinic employee, Louise Christian, that Ms. Lively wrote prescriptions for the Defendant, who would frequent the clinic three or four times a week, and that she also gave him injections of medications. Additionally, Ms. Lively would also write prescriptions in her own name and have Ms. Christian give her the medications.

Additionally, during the week that Dr. Whitley stayed with the Livelys, the Defendant testified that he helped take care of Dr. Whitley, including running errands for him, preparing meals for him, and sitting with him. According to the Defendant, because Dr. Whitley agreed to pay the Defendant fifty dollars a week, so the Defendant quit his logging job. Dr. Whitley, however, left the Livelys the weekend prior to his death. Dr. Whitley's son, Jack, stated that when he arrived at the Lively home he found his father was upset and anxious. Dr. Whitley's son stated that his father looked scared. Jack testified that his father did not have any type of close relationship with the Defendant. Instead, according to Jack, his father told him that he was glad to get away from the Lively home because Dr. Whitley and the Defendant had "got into it," and Dr. Whitley was afraid that the Defendant was going to hit him.

The State also presented testimony was that Kathy Lively was one of only a few people that knew that Dr. Whitley would be alone on Monday evening, the night of the fire. Also, Ms. Lively knew that Dr. Whitley had no phone service in his home as the phone company had not yet reestablished service.

The next morning, Mr. Butler testified that between 8:00 a.m. and 8:15 a.m., when he passed the victim's house driving to work, he "glanced" at the home and noticed that the front door was open and a person was inside the house.

Between 9:00 a.m. and 9:30 a.m., Ms. Lively called into work and asked if anyone had checked on Dr. Whitley. Ms. Lively stated that she was not coming into work because she was going to the doctor about a back problem. The Defendant also called into the clinic that morning to see if Dr. Whitley was going to need his assistance that day. Ms. Christian testified that it was the first time that the Defendant had ever called the clinic asking about Dr. Whitley. Shirley Cline, the employee who took the call from the Defendant, interrupted the conversation to report that Dr. Whitley's house was on fire. About the same time, Ms. Christian noticed that smoke was coming out of Dr. Whitley's house. The fire was reported to McDowell County 911 at 10:17 a.m.

After Dr. Whitley's body was found, the Defendant and his mother's boyfriend, Mike Stafford, went to Dr. Whitley's Coon Branch Mountain home to inform the doctor's wife, Sue Whitley, of his death. After the Defen-

dant left the house, Mrs. Whitley noticed that a computer and printer were missing. The sheriff's department had recovered the laptop computer from someone to whom the Defendant had sold it almost immediately after Dr. Whitley's death for either $150 or $250.

A couple of weeks after Dr. Whitley's death, McDowell County Deputy Sheriff Ronald Blevins learned from a confidential informant that Tommy Owens may have been seen near the Whitley Clinic on the morning of the fire. The deputy questioned Mr. Owens, who told the deputy that he had been with Brian Salyers the morning of the fire. Mr. Salyers told police that he had picked up both Mr. Owens and the Defendant around 7:00 a.m. or a little after on the morning of the fire. The two had asked Mr. Salyers to give them a ride to Dr. Whitley's clinic that morning. Before implicating the Defendant during the interview, the deputy testified that Mr. Salyers acted afraid. At trial, however, while admitting all other portions of his statement, Mr. Salyers recanted the portion of his statement in which he gave the Defendant and Mr. Salyers a ride to Dr. Whitley's clinic.

Further, Jason Ritchie, an inmate in the regional jail, testified that the Defendant told him that the Defendant and Mr. Owens went to Dr. Whitley's home to steal money and drugs; but, instead, took a safe, computer, and a gun. According to Mr. Ritchie, the Defendant told him that as they were leaving, Mr. Owens set Dr. Whitley's home on fire.

The Defendant offered evidence of an alibi, as well as testifying that he did not commit the crimes with which he was charged. Further, defense counsel did a thorough job of bringing to the jury's attention every inconsistency and loophole in the State's evidence against the Defendant.

As the trial court pointed out in denying the Defendant's motion for acquittal, this case rested largely on credibility. The jury simply did not believe the Defendant or his witnesses. "[A] jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Guthrie*, 194 W.Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part. A review of the record reveals that there is sufficient evidence supporting the jury's verdict in this case beyond a reasonable doubt.

### E. Cumulative Error

Lastly, the Defendant argues that the cumulative impact of the errors below resulted in an unfair trial requiring reversal under the "cumulative error doctrine" even if this Court should find that none of the errors viewed separately and individually mandate reversal. The State maintains that there is no basis for finding cumulative error in this case. The Court finds this assignment of error to be without merit. Cumulative error can be found "[w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." Syl. Pt. 5, *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972). Succinctly stated, the record before the Court is devoid of the presence of error. After review, the Court has found no legal or factual basis supportive of any of the alleged assignments of error. Having failed to find numerous errors, the Court concludes that the cumulative error doctrine is not applicable.

### IV. Conclusion

Based upon the foregoing, the decision of the Circuit Court of McDowell County, West Virginia, is affirmed.

Affirmed.

Justice KETCHUM dissents and reserves the right to file a dissenting opinion.

KETCHUM, J., dissenting:

I dissent because the defendant did not receive a fair trial. The State has again convicted a defendant by proving that he had a "bad character" unrelated to the alleged crime. In almost every criminal appeal I review the State prosecutes the defendant's "bad character." Most prosecutors apparently lack the confidence to prosecute only

the defendant's guilt or innocence. I pine for the days when prosecutors had the skills to prosecute the defendant on the issue of his/her guilt. Since the academics convinced courts to adopt the toxic evidentiary rule known as 404(b), defendants are no longer tried solely for their guilt or innocence. *See State v. Willett*, 223 W.Va. 394, 400, 674 S.E.2d 602, 608 (2009) (Ketchum, J., concurring).

### Outrageous and Non–Probative 404(b) Evidence.

The circuit court erred by admitting voluminous 404(b) evidence that had no probative value. The State only called two witnesses who had knowledge of defendant Jason Lively's (hereinafter "Lively") alleged involvement in the murder, one of whom recanted his story on the stand, the other, a jailhouse "snitch" whose story was riddled with inconsistencies. For example, the jailhouse snitch testified that Lively told him that he and his alleged co-conspirator, Tommy Owens [1] beat Dr. Whitley and killed him before setting the house on fire. There were no signs of trauma or bruises on Dr. Whitley and the expert testimony at trial was that Dr. Whitley died as a result of smoke inhalation. The jailhouse snitch also said that Lively bragged about taking a large safe from the house, as well as a computer and a gun. There was no safe, gun or computer missing from the decedent's residence. Another inmate, Harry Caskey, who was housed with both Lively and the jailhouse snitch testified that the jailhouse snitch told him, "All you have to do is say the Lively boy killed the Doc and they'll let you out of here."

By contrast to these two witnesses with supposed direct knowledge of the charged crime, the State put on *14 witnesses who testified as to 404(b) evidence.* This 404(b) evidence fell into three categories: (1) evidence about an October 6, 2002, fistfight at a Friendly Mart Store; (2) evidence relating to an alleged arson attempt of Stacy's Variety Store by Tommy Owens, in exchange for money and/or drugs; and (3) evidence relat-

ing to the theft of a laptop computer from the home of the decedent's estranged wife.

### Fist Fight–Three Years Before the Alleged Crime

The fistfight at the Friendly Mart started when Owens sucker punched a man named Elzie Branham. Branham and Owens had previously been involved in an altercation. Lively was not present during their first altercation. There was no evidence or suggestion that Owens and Lively were actively looking for Branham and intending to assault him. Rather, the evidence was that Owens and Lively came into this store, Branham happened to be there, and Owens instigated a fight with him. Lively did not join in the fight between Branham and Owens; instead, he tackled a man who was with Branham, Randy Birchfield, so that Birchfield would not join in the fight between Branham and Owens. While Lively was not familiar with Birchfield prior to this altercation, the testimony at trial revealed that Birchfield was a disabled coal miner. Additionally, when Birchfield and Lively began fighting, Birchfield's wife attempted to break them up and Lively inadvertently hit her. The State was therefore able to paint Lively as a despicable person who beat up a disabled coal miner and punched the man's wife. The circuit court admitted this evidence finding it demonstrated a common scheme and plan between Lively and Owens to "act together to carry out crimes and violence."

It is beyond imagination that a bar fight that took place three years before the charged crime has probative value demonstrating that Lively and Owens acted together to set a fire that killed Dr. Whitley.

### Stolen Computer Far Away From the Fire Site

In the early afternoon after the fire that killed Dr. Whitley, Lively and Mike Stafford (not a defendant) drove up to Dr. Whitley's Coon Branch residence, ostensibly to tell his estranged wife about the fire. Dr. Whitley's wife was not home when Lively and Stafford arrived and they waited for her to return.

---

**1.** In a separate trial, Owens was acquitted of the charges brought against him in relation to Dr. Whitley's alleged murder. While the record from his trial is not before us, one wonders if the non-probative 404(b) evidence that should have been excluded from Lively's trial was properly excluded from Owens' trial.

When she returned she invited them in, made them coffee and asked Lively if he would clean up the house. (There were many animals at the Coon Branch home and there was dog poop throughout the house which had not been cleaned). Lively got a garbage bag, went from room to room cleaning and allegedly stole a laptop computer that he hid in the garbage bag. Later that day, Lively attempted to pawn the laptop computer.

This theft bears little resemblance to Dr. Whitley's alleged murder. The State's theory of the murder was that Lively and Owens broke into Dr. Whitley's house, threatened and burned him to death because they were after money and drugs that they believed Dr. Whitley had at his residence. It is noteworthy that Lively would allegedly break into a house and burn a man to death in the morning in order to carry out a robbery, but by the early afternoon, he chose not to break into an empty house, instead he waited on the front step for Dr. Whitley's wife to return. Once she returned, Lively did not threaten, burn or murder Dr. Whitley's wife to carry out a robbery, instead he allegedly stole a laptop by sneaking it out in a garbage bag.

Furthermore, the alleged co-conspirator, Owens, was not with Lively when the laptop was allegedly stolen. How in the world does this theft show that Lively and Owens "acted together to carry out crimes and violence" as contended by the State? It does not. The prosecutor had a weak case and convicted the defendant because he was a "bad guy."

### The State's Excuse for Bad Character Evidence

The indictment alleged a conspiracy between Owens and Lively. It alleged in count five that Lively and Owens did "intentionally conspire to commit offenses against the State of West Virginia." The State convinced the judge to allow the introduction of the prior bad acts to show a conspiracy. Then, as soon as the State was done introducing the prejudicial bad-act evidence to the jury, the State dismissed the conspiracy count. Nevertheless, the jury was erroneously allowed

to consider and hear arguments about the prior bad acts, supposedly introduced to show a common plan or scheme (conspiracy).

### Improper 404(b) Instruction

The prior bad acts evidence was tendered by the State and admitted by the court to show a common plan or scheme. Surprisingly, the court instructed the jury that this evidence could be considered in determining motive, opportunity, and intent. No evidence was submitted by the prosecutor or admitted by the judge to show motive, opportunity or intent.

### The Anonymous Witness and The Confrontation Clause Standard of Review

In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53–54, 124 S.Ct. 1354, *see also U.S. v. Ayala*, 601 F.3d 256 (4th Cir.2010). The majority relied on Syllabus Points 6 and 8 of *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006), in deciding the Confrontation Clause issue.[2]

Under Syllabus Point 8 of *Mechling, supra*, almost any hearsay statement is testimonial, even if it is not tendered for the truth of the matter asserted. The United States Supreme Court has refused to give trial courts a definition for testimonial and non-testimonial statements and Syllabus Point 8 of *Mechling* is too expansive. We should adopt a rule that correctly deals with the purpose of the Confrontation Clause, *i.e.*, a defendant has the right to face his accusers. I suggest the correct rule is:

> Testimonial hearsay statements are all accusatory hearsay statements which help prove any element of the crime charged in the indictment or identifies the defendant.

*See*, Michael D. Cicchini and Vincent Rust, *"Confrontation after Crawford v. Washington: Defining 'Testimonial'*," 10 Lewis & Clark L.Rev. 531 (Fall 2006); Thomas J.

**2.** The full text of Syllabus Points 6 and 8 of

*Mechling* are set forth in the majority opinion.

Reed, *"Crawford v. Washington and the Irretrievable Breakdown of a Union: Separating the Confrontation Clause from the Hearsay Rule,"* 56 S.C.L.Rev. 185 (2004).

### Do Our Hearsay Rules Apply to Testimonial Hearsay Statements?

If the out-of-court statements are determined to be non-testimonial then the Confrontation Clause is not applied and our hearsay rules determine the admissibility of the out-of-court statements.

If an out-of-court statement is held to be testimonial the court must first determine if it is admissible under our hearsay rules because courts should not decide constitutional issues if the matter can be decided under evidentiary rules. *See, Three Affiliated Tribes v. Wold Engineering*, 467 U.S. 138, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984).

If the out-of-court testimonial statement is held to be inadmissible under our hearsay rules then the inquiry ends. However, if the out-of-court testimonial statement is held to be admissible hearsay then the court must determine if the statement is barred under the Confrontation Clause.

Although our hearsay rules and the constitutional right of confrontation are similar we have "carefully guarded their distinct functions." *In Re: Anthony Ray Mc.*, 200 W.Va. 312, 489 S.E.2d 289 (1997).

### Conclusion

A complete review of the trial transcript and my years of trial experience tell me that this defendant did not receive a fair trial. It isn't even close! Even people with "bad character" are entitled to a fair trial. With all due respect to my colleagues, I dissent.